OPINION OF THE COURT
FUENTES, Circuit Judge.
Defendant-appellant Asida Washington was ensnared by a “stash house reverse sting” operation — one which hit many of the by-now-familiar beats.[1] Acting on what appeared to be insider information from a drug courier, Washington and his three co-conspirators planned to rob a Philadelphia property where they thought 10 kilograms of cqcaine were being stored for distribution. But as they discovered on the day of the robbery, the “stash house” was a trap set by law enforcement. Then “courier” was an undercover federal agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (“ATF”), which had developed the scenario from the ground up. The cocaine did not exist.
Under federal law on conspiracy and attempt, the government could, and did, prosecute the crew as if fantasy had been reality. Washington, the sole member to take his chances at trial, was convicted by a jury of two Hobbs Act robbery charges *197 and two drug charges (18 U.S.C. § 1951(a) and 21 U.S.C. § 846), although he was acquitted on a gun charge.
Developed by the ATF in the 1980s to combat a rise in professional' robbery crews targeting stash houses, reverse sting operations have grown increasingly controversial over the years,' even as they have grown safer and more refined. For one, they empower law enforcement to craft offenses out of whole cloth, often corresponding to statutory offense thresholds. Here, the entirely fictitious 10 kilograms of cocaine triggered a very real 20-year mandatory minimum for Washington, contributing to a total sentence of 264 months in prison — far more than even the ringleader of the conspiracy received. For another, and as Washington claimed on multiple occasions before the District Court — and now again on appeal — people of color are allegedly swept up in the stings in disproportionate numbers.
These elements of controversy are bound up in the three claims Washington now raises on appeal. Two are constitutional claims: Washington challenges his conviction and sentence by arguing that the use of the statutory mandatory ‘minimum term violated his rights to due process, and he also alleges that the attorney who represented him at trial rendered constitutionally ineffective assistance. While stash-house reverse stings can raise constitutional concerns, the use of a mandatory minimum sentence on these particular facts did not deprive Washington of his right to due process. And while this is the rare case where a claim of ineffective assistance, of counsel was properly raised on direct appeal instead of through a collateral attack, Washington has not. shown prejudice sufficient to call into doubt the.integrity of his trial. We thus conclude that both constitutional claims are without merit.
The remaining claim challenges the District Court’s decision to deny Washington pretrial discovery on ATF’s operations and enforcement statistics. Washington contends that, in denying his motion, the District Court erroneously relied on the hard-to-meet test for “selective prosecution” discovery developed by the Supreme Court in United States v. Armstrong[2] and United States v. Bass[3] (which we will refer to as “Armstrong/Bass”). He encourages us to follow instead the en banc Seventh Circuit’s recent opinion in United States v. Davis[4] which distinguished between claims of selective prosecution and selective law enforcement and appeared to endorse a' relaxed discovery standard for the latter.
Like the Seventh Circuit, we conclude that the proposed distinction between enforcement and prosecution is well taken, and that the law supports greater flexibility when the discretionary decisions of law enforcement, rather than those of prosecutors, are targeted by a defendant’s request for discovery. We therefore hold that a district court may exercise its discretion to grant limited discovery, or otherwise to conduct in camera analysis of government data before deciding whether limited discovery is warranted. A district court may do so even if a defendant seeking discovery on a selective enforcement claim has not otherwise met his or her full burden under Armstrong/Bass. Because the District Court in this case thought that its. discretion was cabined by Arm *198 strong/Bass, and because we cannot otherwise say that the same result would have occurred under the standard we announce today, we will vacate the orders denying discovery and remand for limited post-judgment proceedings. The judgment of conviction and sentence are otherwise unaffected by this remand.
I. Background
A. The Plan[5]
Codefendant and ringleader Dwight Berry came to the attention of the ATF in late 2012, when he made it known that he was interested in conducting robberies of drug users and dealers. In the- course of asking around, Berry spoke to an acquaintance who, unbeknownst to him, was an ATF confidential informant (“Cl”). The Cl alerted the ATF, which determined that Berry’s criminal history fit its required profile for a sting operation and opened an investigation in February 2013, under the supervision of ATF Special Agent John Bowman. From here on out, many of the meetings and phone calls about the developing robbery plan would be surreptitiously recorded for playback at trial.
Meanwhile, the Cl kept Berry on the line with word of a connection: a drug-courier friend who frequented a South Philadelphia stash house on his trips to and from New York. When Berry and the Cl met again, they were joined by the supposed drug courier — in reality, undercover ATF Special Agent Patrick Edwards, a veteran of over a dozen robbery scenarios. In his role as the courier, Edwards reported seeing over 10 kilograms of cocaine (in the context of cocaine “bricks”) inside a cooler during a trip to the stash house. Berry indicated that he knew of a crew who might be interested in participating in the robbery and that he was willing to engage in violence if necessary.
Washington first entered the picture about a week and a half after this encounter as one of two members of Berry’s proposed robbery crew (the other man, never identified, apparently dropped out of the plan shortly afterwards). At another meeting in early March 2013 with Berry, Edwards, and the Cl, Washington probed Edwards about the logistics of the robbery: what level of resistance they could expect, whether the house would be watched from the outside, and so on. Prompted by Edwards, the conspirators also discussed how to move and sell the stolen cocaine,[6]
In a subsequent phone discussion, Edwards pressed Berry on the professional *199 ism of his crew. Berry, in an attempt to reassure, told Edwards that “[t]his is what [our crew] do[es].”[7] When Edwards singled out Washington for concern over a perceived lack of robbery experience, Berry said that Washington “rock[ed] out” and “put work in,” which Edwards interpreted to mean that Washington was some sort of shooter or enforcer.[8]
On the day of the robbery, Washington and Berry met at Berry’s mother’s house, where Berry picked up two guns and hid them in an Eggo Waffles box. The group, which had added two new members — code-fendants Antonio Ellis and Jermau Johnston — then gathered in the parking lot of the Philadelphia Airport Hilton to review its plan. (Washington’s girlfriend was also present, although she did not participate and remained in her parked car.) Edwards went over the salient details once more, emphasizing the 10 kilograms of cocaine and explaining that no money would be found in the house.
In three cars — Berry, Ellis, and Johnston in a minivan; Washington and his girlfriend (the latter driving) following behind in a Chrysler 300; and Agent Edwards bringing up the rear — the crew made its way to the chosen address on Passyunk Avenue in southwest Philadelphia. As the caravan moved in, agents swooped down. All but Berry surrendered; Berry fled on foot but was apprehended shortly afterwards. From the minivan, law enforcement recovered two guns, ammo, gloves, and zip-ties. From Washington’s Chrysler 300, they recovered a backpack, gloves, a mask, a lighter, and lighter fluid.
B. Procedural History
What follows is an abbreviated summary of the criminal proceedings, setting up the claims that Washington now raises on appeal. We will return in greater detail to the salient parts later, in the Analysis section of this opinion.
1. Indictment; Codefendants Plead Guilty
In April 2013, the four men were indicted in the Eastern District of Pennsylvania. Counts 1 and 2 of the indictment charged attempt/conspiracy to commit Hobbs Act robbery (18 U.S.C. § 1951(a)), while counts 3 and 4 charged attempt/conspiracy to possess with intent to distribute five kilograms or more of cocaine (21 U.S.C. § 846 through 21 U.S.C. § 841(a)(1), (b)(1)(A)). Count 5 charged all of the defendants with carrying a firearm during a crime of violence (18 U.S.C. § 924(c)) and count 6 charged all but Johnston with being felons in possession of a firearm (18 U.S.C. § 922(g)(1)).[9]
Washington’s codefendants eventually pleaded guilty. Johnson and Ellis received 27-month and 46-month sentences, respectively. Although Berry, the ringleader, faced a Guidelines range of 270-322 months, his binding plea agreement reflected a 180-month sentence,[10] and the government did not seek to formally introduce his previous, eligible convictions to secure an enhanced mandatory minimum penalty. Berry ultimately received the agreed-upon 180-month custodial sentence.
Unlike his codefendants, Washington pleaded not guilty and prepared for trial. *200 He was assigned a Criminal Justice Act attorney, whom we will refer to as the “defense, counsel” or “trial counsel.”
2.Motion for Discovery
During the pretrial phase, Washington moved (both pro se and through trial counsel) for discovery relating to sting operations and related prosecutions, which he claimed to be racially motivated. Trial counsel’s filing cited three prior federal prosecutions in which all of the defendants were African .American. The moving papers also clarified that the discovery was sought not for trial defense, but rather to support a motion to dismiss the indictment on the basis of “racial profiling or selective prosecution ... by the Philadelphia District Office of [ATF] , in complicity with” the U.S. Attorney’s Office.[11]
After oral argument, and as set forth in a thoughtful opinion, the District Court denied Washington’s motion for discovery. Finding the Armstrong/Bass standard to control, the District Court held that Washington failed to meet this “rigorous standard to obtain discovery,”[12] and later denied Washington’s requests for reconsideration.
3.Recordings Deemed Admissible; Government Seeks Enhanced Mandatory Penalties.
With discovery denied, Washington did not file' an actual motion to dismiss the indictment, and the parties otherwise prepared for trial. In an important ruling, the District Court decided that the government could use the audio and video recordings and related transcripts at trial. Meanwhile, the government-filed a 21 U.S.C; § 851 information stating that Washington had a prior Pennsylvania drug felony conviction from 2004 — a prerequisite to enhanced mandatory minimum penalties at sentencing.
4.The District Court Revisits Discovery on the Eve of Trial
In June 20Í5,' prior to opening statements, the District Court- revisited the matter of discovery in the context of' trial defenses. Referring back to United States v, Alexander,[13] a Northern District of Illinois 'opinion cited in the earlier decision denying discovery, the District Court ordered the government to release redacted portions of an ATF policy manual on stash house sting operations — patterned after the disclosures ordered in Alexander. The District Court then issued a protective order restricting defense counsel’s use of the disclosed material.
5.Washington’s Trial
Over the five-day trial, defense counsel used the ATF disclosures to advance his theory of the case: Washington did not have the requisite intent, to commit a dubious, discriminatory “conspiracy” that ATF had designed .from the ground up.[14] For instance, counsel pointed to Washington’s use of a separate vehicle and the presence of his girlfriend on the day of the robbery to suggest that he was cautious and not fully committed. Counsel also utilized .the disclosed ATF materials to cross-examine supervising ATF Agent Bowman.
*201 But during -that cross-examination, trial counsel appeared to fumble. He was attempting to show that, as Agent Bowman would later admit, the only person “targeted” by the ATF prior to the arrest was Berry, and that the ATF knew nothing about the other conspirators and could not have ensured that they fit its target profile, which required (in part) a violent criminal history. But in addition to asking whether Washington had a prior robbery arrest (which he did not), trial counsel also asked Agent Bowman whether Washington had a drug arrest. This question effectively allowed the prosecution to bring out" Washington’s prior drug conviction on redirect.
6.The Jury Verdict
The jury returned a guilty verdict on counts one through four of the superseding indictment: the drug and Hobbs Act robbery charges. It returned a not-guilty verdict on firearm count five; firearm count six was dismissed on the government’s motion.[15] The jury specifically found that the government proved beyond a reasonable doubt that the (fictitious) cocaine at the center of the conspiracy was five kilograms or more.
7.Pre-Sentencing Investigation into Trial Counsel’s Constitutional Effectiveness
Shortly after the trial, Washington wrote a letter to the District Court requesting a substitution of attorney. He alleged, in part, that trial counsel had been under the influence of alcohol throughout the trial.
The District Court swiftly reacted, appointing a new Criminal Justice Act' attorney, Mark Greenberg — who has represented Washington -ever since — in what became, in effect, a pre-sentencing investigation of trial- counsel’s performance. After the- District Court held- an evidentiary hearing, Attorney Greenberg filed a formal motion for new trial predicated on the alleged ineffective assistance-of trial counsel. This motion included an attack on trial counsel’s questions during cross-examination of Agent Bowman that opened the door to the introduction- of Washington’s drug conviction. The motion was ultimately denied, with the District Court finding in part that the “mountain” of evidence against Washington forestalled a showing of prejudice under the two-part Strickland v. Washington[16] test for ineffective assistance of counsel.[17]
8.Sentencing Proceedings
The ineffectiveness question resolved for the time being, the parties and District Court prepared for sentencing. Because of his criminal history, Washington was classified as'a “Career Offender” under the Sentencing Guidelines. 'As a result of Guidelines calculations we.need not delve into, that Career Offender status overrode the lower Guidelines level derived from quantity of drugs, yielding a sentencing range of 360 months to life in prison.[18]
In his sentencing memoranda, Washington challenged the proposed sentencing range, emphasizing the troubling nature of the sting operation and requesting that the District Court take into account the sentences of his co-conspirators. He also asked the District Court to disregard .the mandatory minimum sentence of 20 years; if “the reverse sting in this , case involved *202 0.9 kilograms of non-existent cocaine,” he argued, “Mr. Washington would not be facing a mandatory minimum sentence.”[19] In response, the government emphasized that the mandatory minimum penalty was just that: mandatory. Evincing some discomfort with the 20-year mandatory minimum, the District Court nevertheless ruled that he was “bound to follow the law,”[20] imposing a 24-month sentence on the Hobbs Act robbery charges and a 240-month consecutive sentence on the drug charges for a total term of 264 months’ imprisonment. Washington timely appealed.[21]
II. Analysis
Washington’s constitutional challenges, which directly attack the judgment of conviction and sentence, are considered first. We will then turn to his Armstrong/Bass discovery claim.
A. Ineffective Assistance of Counsel
Although he again inyokes trial counsel’s alcohol use, Washington otherwise limits his ineffectiveness claim on appeal to the incident where trial counsel opened the door to testimony about his drug conviction. He attacks the District Court’s determination that the “overwhelming” evidence at trial precluded a showing of prejudice, and emphasizés, in particular, the jury’s acquittal on the firearm count and an alleged conflation of the prejudicial impact of the admission on the robbery counts with the far-greater impact on the drug counts.
1. Ineffectiveness Claims on Direct Appeal
We open with the observation that ineffective assistance of counsel claims are generally not considered on direct appeal. Instead, they are more commonly brought in a collateral proceeding, such as through a post-conviction 28 U.S.C. § 2255 motion to vacate.[22]
Our “general aversion”[23] to reaching ineffectiveness claims on direct appeal derives in part from their inherently collateral nature. The trial record, concerned as it is with the defendant’s guilt or innocence, will not in most instances be “developed precisely for the object of litigating or preserving the [ineffective assistance] claim and thus [will] often [be] incomplete or inadequate for this purpose.”[24] Deferring the question of ineffectiveness to collateral review also protects criminal defendants from the consequences of resolving the claims prematurely.[25]
While cautioning that we will not “open[] the door to ineffective assistance of counsel claims on direct appeal as a matter of course,” we have nevertheless *203 recognized an exception to the rule when the trial record “is sufficient to allow determination of ineffective assistance of counsel.”[26] Determining sufficiency is case- and claim-dependent.
We think that Washington’s is the uncommon case where resolving an ineffectiveness claim on direct appeal is both feasible and efficient. Strictly speaking, he is not raising ineffectiveness for “the first time” on appeal. Rather, ineffectiveness was invoked in and resolved by the District Court, which held a post-trial, pre-sentencing hearing at which Washington and the AUSA both testified (trial counsel was invited to testify, but declined). The District Court — the trial judge — then denied the claim against the backdrop of the recently concluded trial.[27] This development of the record amounted to, in effect, a mini collateral proceeding, akin to what is ordinarily expected under § 2255. It provides us with a sufficient foundation for direct appellate review.[28] We therefore exercise our discretion to reach the ineffectiveness claim.[29]
2. Strickland v. Washington and Standard of Review
“Regardless of whether an ineffective assistance of counsel claim is raised in a motion for a new trial, on collateral review, or on direct appeal, the standard of *204 review is the same.’’[30] Under the familiar two-part standard established in Strickland v. Washington,[31] Washington bears the burden of showing 1) that trial counsel’s actions “were not supported by a reasonable strategy” and 2) that trial counsel’s errors were prejudicial.[32] “[B]oth deficiency and prejudice must . be proven to have a valid'claim for relief.”[33] On appeal of the District Court’s decision, we exercise plenary review over the legal components of-ineffectiveness, assess any underlying findings of fact for clear error, and “exercise independent judgment on whether those facts, as found by the District Cour£, show that counsel rendered ineffective assistance.”[34]
We agree with the District Court that the general allegations of alcohol use do not require a departure from Strickland’s two-prong standard — a point conceded by Washington in his new-trial memorandum.[35] Alcohol;or drug use by trial counsel can certainly be relevant to both parts of an ineffectiveness inquiry, especially if amplified or systemic, or on close questions of strategy and jury perception. But oh these facts, alleged substance abuse is not, without more, one of the rare forms of dereliction amounting to the per se denial of a defendant’s Sixth Amendment right to the effective assistance of counsel.[36]
3. Trial Counsel’s Cross-Examination of Agent Bowman
Washington now limits his ineffectiveness allegation to the cross-examination of ATF Agent John Bowman, which allowed the prosecutor to bring out Washington’s previous drug conviction on redirect. He argues that trial counsel’s line of questioning lacked a strategic basis and caused him prejudice, as it undermined the “not committed to the crime” theory of defense.
By way of background: Agent Bowman, who-managed the ATF’s investigation of the conspiracy, was called to testify as the government’s final witness. His testimony established, among other things, the authenticity of the recorded calls and meetings among the conspirators (or “conspirator,” in the case of the undercover Agent Edwards) and their incriminating nature. ■For instance, Bowman testified that at the March 5 meeting, Berry assured Agent Edwards that Washington was committed to the robbery plan.
Trial counsel’s extensive cross-examination of Agent Bowman dealt in part with inconsistencies in the investigation and in ATF’s targeting of Washington. Counsel *205 also probed the racial dimensions of ATF sting operations; Bowman admitted that he had participated in three Philadelphia sting operations, all of which targeted only African American defendants. (A similar response had earlier been elicited, from Agent Edwards, who admitted that perhaps two defendants in over 13 scenarios were not African American — and both of those were Latino.)
Trouble arose-when trial counsel began asking Bowman about Washington’s uneasy fit with the ATF targeting guidelines’ requirement of prior criminal histories.
Q: All right. Now we know that you didn’t use — they didn’t have my client identified before he was arrested. You knew him as Ski, or some- other name, right?
A: Correct.
Q: So you didn’t know if he had a prior criminal history, right? '' ■
A: No, not during the investigation.
Q: All right. And you found out after the arrest and some checking, you found out that my client doesn’t have a history for robbery, right? '
A: (No verbal response)'
Q: And he doesn’t have a history for drugs, does he?
A: I don’t recall.
Q: If he did, you would, recall, sir, wouldn’t you? Isn’t that fair?
A: I don’t want to misstate, but I’m pretty sure he had a—
Q: If you’re not sure, you probably shouldn’t say—
A: —drug arrest.[37]
Q: —you probably shouldn’t say, you’re not sure. I’ve had his record, and I can say, I didn’t see a robbery conviction.
A: I don’t think there’s a robbery conviction, no.
Q: And I have his record, ! didn’t see a drug conviction.
A: I don’t recall.[38]
But Washington did have a drug conviction. In fact, just a few days before Bowman took the stand, the government had filed its 21 U.S.C. § 851 information identifying a ‘"prior felony controlled'substance violation” that it intended to use “as the basis for increased punishment” in the event that Washington was convicted.[39]
While ..Bowman had not directly confirmed Washington’s criminal history on cross, the prosecutor saw the door swing open and, on redirect, invited Agent Bowman to stroll through it:
Q: [Trial counsel] asked you some questions about Mr. Washington’s criminal history.
A: Yes.
Q: You said you weren’t sure when he asked-■ you specific questions about whether he had a drug conviction, whether he had a robbery conviction, whether he had a violent crime conviction. You said, I don’t recall—
[[Image here]]
Q: You said you weren’t sure, correct?
A: Correct,
Q: I want to take a moment and show you Government Exhibit’ 403, 404 and 405. That’s Government Exhibit 403. Let’s move on to 404. And lastly, we *206 move on to Government Exhibit 405. Did you review those three exhibits?
A: Yes.
Q: And after reviewing them, are you sure whether or not Mr. Washington has a prior drug conviction?
A: He does have a prior drug conviction.[40]
After this exchange, the issue of Washington’s criminal history does not appear to have come up again during trial. Further, trial counsel did not request, and the District Court did not give, any limiting instruction.
4. Strickland’s Prejudice Prong
We may consider the two Strickland prongs in either order; and, as we have observed, it is “often practical to consider the prejudice prong first,”[41] not the least because we “prefer[] to avoid passing judgment on counsel’s performance when possible.”[42] Accordingly, we turn first to prejudice, which requires showing a “reasonable probability” — a “probability sufficient to undermine confidence in the outcome” — that, “but for counsel’s unprofessional errors, ‘the result of the proceeding would have been different.’ ”[43]
At the outset, we agree with the District Court that the evidence admitted at trial against Washington was daunting and, generally, damning. His recorded statements alone, bluster or not, showed a willing and inquisitive member of the conspiracy. On the day of the robbery itself, Washington appeared committed to its success.[44] Washington attempts to push back on this reading of the record, but the big picture of the trial works against him.
For instance, in support of his argument that the evidence was not actually “overwhelming,” he points out that the jury acquitted him of the count-five § 924(c) gun charge — which, unlike counts 1 through 4, was not a conspiracy or attempt charge. This is true, but we struggle to assign it more than limited relevance. The trial evidence showed that Berry, not Washington, hid the guns in the Eggo Waffles box, which he then handed to co-conspirator Johnson. The guns were found in the minivan, not Washington’s Chrysler, when the caravan was taken down. Culpability arguably shifted away from Washington, and he has not satisfactorily shown how the jury’s apparent doubt with the firearm count is linked with the quantum of proof on the remaining counts of the indictment.
Similarly, Washington points to two jury requests — one to see the video of the take-down, and another regarding the definition of entrapment or enticement — as indicative of its hesitance to convict. The video was played back, and both the prosecution and defense agreed that entrapment was not at issue. Beyond that, we do not think that the jury’s questions evince the kind of doubt that might meet Washington’s burden for showing prejudice. If anything, all we can draw from the acquittal on this count is that the jury took seriously its *207 duty to view the trial evidence on a count-by-count basis.[45]
Washington also argues that the District Court erred by failing to separate the Hobbs Act robbery and drug counts in determining prejudice, contending the testimony about his drug conviction, and thus his propensity, affected the latter far more than the former.[46] He emphasizes that the defense’s theory of the ease rested in part on caution and lack of culpable intent, and points to selections of the recordings, admitted at trial, that show (or so he claims) that he was wary of cocaine and was not interested in dealing with it or otherwise becoming involved. In one of these, Washington is recorded as saying that he “don’t fuck with coke.”[47]
Even in light of the defense’s theory of the case, however, we do not agree that the charges can be so neatly separated. Washington wants us to view the likelihood of prejudice from admitting the conviction as higher for the drug counts than the robbery counts.[48] The fundamental flaw of Washington’s argument is that he never quite explains, in a way that satisfies his Strickland burden, why he would have participated in the robbery, or even in its planning stages, if not for the cocaine. According to the testimony of ATF Agent Edwards, the “drug courier” told the other members of the conspiracy that no money would be found in the house. Even if Washington did not intend to personally handle the cocaine or move it for sale, he could not help but know that cocaine was the object of the robbery. Viewed against this backdrop, the “I don’t fuck with coke” statement does not carry the expansive and exculpatory meaning that he would like to attribute to it. Moreover, we agree with the government that the broader defense strategy of the case, which focused on showing that Washington lacked the violent criminal history required for ATF targeting, was not necessarily undermined by a fleeting mention of Washington’s pri- or drug conviction, especially in light of his apparent willingness to participate in the broader drug conspiracy.[49]
We do not mean to trivialize the introduction into the case of Washington’s drug conviction; although we do not formally reach the Strickland performance prong, *208 we struggle to perceive a strategic basis for opening the door. Nevertheless, we agree with the District Court that Washington has not met his- burden, under Strickland, of showing that the mistake undermined confidence in the jury’s verdict.[50] Accordingly,, the ineffective assistance claim fails..
B. Mandatory Minimum Due Process Challenge
In challenging his 264-month sentence, Washington argues that the District Court erred in following the 20-year mandatory minimum term set forth in 21 U.S.C. § 841(b)(1), which (as applicable here) kicks in when the quantity of cocaine is 5 kilograms or above and the defendant has a prior felony drug conviction. He does not appear to disagree with the government that, in the ordinary course of things, the “mandatory” minimum is precisely what it says on the tin.[51] Nor does he argue that the facts supporting the mandatory minimum sentence — an indictment charging 5 kilograms or more of cocaine,- a corresponding jury verdict, and a properly filed § 851 notice of a prior conviction — were absent or infirm. Rather, he contends that its application in this kind of case, where the comprising elements were entirely fictitious and in the hands of the government, violates his right to due process.
1. Standard of Review
We begin by noting that although Washington did object to the mandatory minimum at sentencing, he argued there on the basis of congressional intent, not due process. The due process argument also does not appear in his three sentencing, memoranda. While Washington’s failure to develop the constitutional basis for his objection might ordinarily limit the scope of our review, we retain discretion to reach unpreserved arguments in appropriate circumstances.[52] Here, the government asks us to .conduct de novo review and responds to Washington’s argument on the merits. While a party’s concession does not control the exercise of our discretion, it is certainly a factor we inay consider. Hence, because Washington did raise an objection to the application of. the mandatory minimum sentence, and the argument that he relied on came within a stone’s throw of the one he raises,now, we will “waive the waiver” and consider Washington’s claim on the merits.[53] As a constitutional chal *209 lenge to the mandatory minimum, it draws plenary review.[54]
2. Outrageous Government Conduct and Sentencing Factor Manipulation[55]
Washington’s due process challenge falls within the broader category of “outrageous government conduct” — that is, an allegation that the government’s conduct was so outrageous that due process and fundamental fairness cannot, abide the defendant’s conviction.[56] In our hallmark case on the doctrine, United States v, Twigg, we decided that a meth scheme that was substantially engineered by the government — agents supplied precursor chemicals (at a significant discount), glassware, and a rented farmhouse for a lab— displayed the requisite-level of outrageousness.[57] Twigg led to the ultimate sanction: reversal of the defendant’s conviction,[58]
But Twigg, decided in 1978, is apparently one of only “two reported court of appeals decisions ... that have deemed the government’s conduct so outrageous as to violate due process.”[59] We have found no occasion since Twigg in a published decision to reverse a conviction or invalidate an indictment on the theory that the government has strayed outside of the bound *210 aries contemplated by due process.[60] In United States v. Dennis, for instance, we refused to dismiss an indictment in a reverse sting case not dissimilar to the one now at bar, while emphasizing the “exceedingly great” evidentiary burden placed on the challenging defendant.[61]
While our Twigg decision recognized an outrageous government conduct claim in the context of an attack on an indictment — and, by extension, the fact of the judgment of conviction itself — other courts have applied similar reasoning to a narrower universe of sentencing-related claims, often under the label “sentencing factor manipulation” — although they have not done so consistently.[62] The Eleventh Circuit described one model of sentencing factor manipulation in United States v. Ciszkowski:
[Sentencing factor manipulation occurs when the government’s manipulation of a sting operation, even if insufficient to support a due process claim, requires that the manipulation be filtered out of the sentencing calculus. Outrageous government conduct would necessitate the reversal of a defendant’s conviction, while sentencing factor manipulation would simply reduce the sentence applied to his conduct.... .When a court filters the manipulation out of the sentencing calculus before applying a sentencing provision, no mandatory minimum would arise in the first place.[63]
Our previous precedential opinions have declined to take a definitive stance on the viability of this doctrine in our Circuit.[64] But even assuming without deciding that the generous Ciszkowski framing of sentencing factor manipulation should apply — requiring a lesser showing than an “outrageous conduct” claim, and allowing for a District Court to depart below the mandatory minimum range — we find that Washington has failed to demonstrate, on the facts of this case, that the mandatory minimum should be excised from the indictment.
At bottom, Washington argues that the government was uniquely positioned to determine the salient facts of his offense, which he was powerless to refute. Working through its undercover operative and informant, the ATF did indeed set the amount of the fictitious cocaine (10 kilograms) and played up the likelihood of resistance (thereby encouraging the conspirators to arm themselves).
But even assuming some impropriety here on the part of the government, most of the factors it created for the crime, and which were within its unique control, were *211 not the drivers of Washington’s actual sentence. Agent Edwards told the conspirators that they would encounter resistance, so they brought guns — and, had Washington been convicted of the gun charge, he would have faced an additional mandatory consecutive term.[65] But he was not. Further, Agent Edwards told the conspirators that they could expect to recover 10 kilograms of cocaine in the robbery, corresponding to 2014 Guidelines base offense level of 30.[66] However, because he was a career offender, Washington’s Guidelines range was not governed directly by the 10 kilogram drug-quantity amount — and the District Court sentenced him far below the recommended Guidelines range anyway.[67]
Instead, the 20-year mandatory minimum was the product of two factors: the 5 kilograms of cocaine charged in the indictment and found by a jury, and the § 851 statement filed by the government.[68] The latter, as the Supreme Court has indicated, is a matter of discretion “similar to the discretion a prosecutor exercises when he decides what, if any, charges to bring against a criminal suspect ... and is appropriate, so long as it is not based upon improper factors.”[69] Washington does not argue that the process envisioned by § 851 was not properly followed or was based on impermissible considerations.[70]
So it comes down, in the end, to the drug quantity. We acknowledge Washington’s concerns, which are well stated and logical, that the drugs did not exist, and that his ironclad mandatory minimum has *212 no real-world foundation. Other courts of appeals, however, have roundly rejected claims that amounts greater than 5 kilograms, or even 10 kilograms, amount to sentencing factor manipulation.[71] Further, ■Agent Edwards testified at trial that the amount chosen for the sting was a “conservative” .number based' upon the drug weights found in “a typical [Philadelphia] stash house.”[72] He explained that the proposed scenario “always has to be realistic” or it might be questioned by the robbery crews.[73] Washington has not offered anything to the contrary. Put simply, there is not enough here for us to conclude that the government chose the 10 kilogram amount primarily, or even secondarily, “to inflate [Washington’s] sentence upon a conviction.”[74]
Washington encouragós us to follow the reasoning of United States v. McLean, in which a different judge in the Eastern District of Pennsylvania sentenced below the mandatory minimum, on due process grounds, in a reverse-sting stash house case.[75] McLean, which is nonbinding,[76] is also distinguishable. The defendant there received a “split” jury verdict on the amount of cocaine involved: 5 kilograms with regard to conspiracy but 500 grams with regard to attempt.[77] We detect no equivalent ambiguity in the jury’s verdict on Washington’s ultimate culpability, and therefore reject this argument.[78]
*213 In sum, we conclude that the 5 kilograms of cocaine charged in the indictment and found by the jury did not amount to an impermissible manipulation of sentencing factors by the government. To the extent that the fictitious 10 kilogram quantity is relevant, we find' too that Washington has shown neither improper manipulation nor prejudice. Nevertheless, we remind the government that we have expressed misgivings in the past about the wisdom and viability of reverse stash house stings. That this case fell on the safe side of the due process divide should not be taken to indicate that all such prosecutions will share the same fate. As one of our colleagues said in a prior ease, “I do not find it impossible for the Government to exercise its discretion rationally to set up stash house reverse stings. But I share the concern that this practice, if not properly checked, eventually will find itself on the wrong side of the line.”[79]
G, Selective Enforcement Discovery Claim
Finally, Washington appeals in part the denial of his pretrial motion for discovery, which he filed in order to “prepare a motion to dismiss the indictment on the basis of racial profiling and/or selective prosecution of racial minorities by the ATF Office in Philadelphia, in conjunction with the' local U.S. Attorney’s Office.”[80] He contends that the District Court erred in applying a strict discovery standard — Armstrong/Bass—to the portions of his motion that pertained to law enforcement and ATF material on . stash-house reverse stings, as opposed to those portions (the denial of which he does not appeal) that sought information related to the prosecútion of those offenses. Instead of employing Armstrong/Bass, Washington contends, we should follow the Seventh Circuit’s opinion in United States v. Davis, which appeared to depart from the Armstrong/Bass model for claims of selective enforcement in stash house cases.
While discovery rulings are ordinarily reviewed for abuse of discretion, “we exercise de novo review over the standards the district court used in exercising its discretion.”[81] And although we decline to adopt Davis wholesale, we nevertheless agree with the Davis court that district judges have more flexibility, outside of the Armstrong/Bass framework, to permit and manage discovery on claims like Washington’s. Accordingly, as explained further below, we will vacate the District Court’s discovery orders and issue a limited remand for further post-judgment proceedings.
*214 1. Substantive Equal Protection Claims: “Clear Evidence” of Discriminatory Effect and Intent
Washington’s argument rests on the distinction between “selective prosecution” and “selective enforcement,” labels that we (and others) sometimes deploy interchangeably. Here, we use them as Washington does. “Prosecution” refers to the actions of prosecutors (in their capacity as prosecutors) and “enforcement” to the actions of law enforcement and those affiliated with law-enforcement personnel.
We start with a point of commonality, Substantive claims of selective prosecution and selective enforcement are generally evaluated under the same two-part test, which is derived from a line of seminal Supreme Court cases about the collision between equal protection principles and the criminal justice system.[82] A defendant challenging a criminal prosecution at either the law enforcement or prosecution inflection points must provide “clear evidence” of discriminatory effect and discriminatory intent (the latter is sometimes referred to as “discriminatory purpose”).[83] Meeting this standard generally requires evidence that similarly situated individuals of a difference race or classification were not prosecuted, arrested, or otherwise investigated.[84]
2. Armstrong/Bass: “Some Evidence”
A criminal defendant, however, will not often have access to the information, statistical or otherwise, that might satisfy a “clear evidence” burden. Thus, the two component cases that make up the Armstrong/Bass test — United States v. Armstrong[85] and United States v. Bass[86], both of which arose from selective prosecution challenges — propounded a facially less rigorous standard for criminal defendants seeking discovery on an anticipated selective prosecution claim. Instead of “clear evidence,” a successful discovery motion can rest on “some evidence.”[87] “Some evi *215 dence” must still include a showing that similarly situated persons were not prosecuted.[88] Furthermore, under Armstrong/Bass, the defendant’s showing must be “credible” and cannot generally be satisfied with nationwide statistics.[89]
A'i'mstrong/Bass has proven to be a demanding gatekeeper. In developing it, the Supreme Court sought to “balance[] the Government’s interest in vigorous prosecution and the defendant’s interest in avoiding selective prosecution” by creating a standard that, while difficult to meet, derived from “ordinary equal protection standards” and was not “insuperable.”[90] The lived experience, however, has resembled less a challenge and more a rout, as practical and logistical hurdles abound— especially to proving a negative.[91] The government itself concedes that “neither the Supreme Court nor this Court has ever found sufficient evidence to permit discovery of a prosecutor’s decision-making policies and practices.”[92]
So, too, in Washington’s case, as the District Court here found that his discovery motion had fallen short of Armstrong/Bass. His list of three prior stash house cases, the District Court determined, revealed nothing about similarly situated individuals who were not ensnared in stash-house stings, and Washington had otherwise not shown discriminatory intent/purpose.[93]
3. Armstrong/Bass in “Selective Enforcement” Cases
On appeal, Washington does not argue that the District Court’s Armstrong/Bass analysis was wrong, but rather that Arm *216 strong/Bass — which arose from discovery-aimed. at claims of selective prosecution, not selective enforcement — should not have applied at all to the subset mf his claims seeking law-enforcement evidence, “The sort of considerations that led to the outcome in Armstrong,” he contends, “do not apply to ,.. ATF agents engaged in racial discrimination when selecting targets for sting operations, or when deciding which suspects to refer for prosecution,”[94] Washington also points to the difficulty of obtaining pre-discovery statistics in selective prosecution cases, arguing that requiring the same in law-enforcement cases— when there are likely to be no records of similarly situated individuals who were not arrested or investigated — would transform the functional impossibility of Armstrong/Bass into a complete impossibility,[95] While substantive selective prosecution and enforcement cases must ultimately reach the same destination' — “clear evidence” of discriminatory purpose/intent and effect — Washington suggests that enforcement cases, which do not implicate the heightened protections afforded, to prosecution decisions, should be permitted to travel on a less rocky path.
We have not previously addressed this particular prosecution/enforcement distinction in a precedential decision.[96] And it is true that Armstrong and Bass, both of which arose from selective prosecution claims, were grounded in part on the special solicitude courts have shown to prosecutors’ discretion. For • instance, -the Armstrong Court- said that a “selective-prosecution claim is not a defense on the merits to the. criminal charge itself, but an independ&nt assertion that the prosecutor has brought the charge-for reasons forbidden by the . Constitution,” and because of the great deference owed to prosecutorial decision-making, the Court was reluctant to abrogate the “background presumption” ■ that “the showing necessary to .obtain discovery should itself be a. significant barrier-to the litigation of insubstantial claims.”[97] ; •
Other courts of appeals, however, havé extended the reasoning of Armstrong/Bass to claims of ■ selective enforcement and have applied the same burden (“some evidence”) to the related discovery requests. The Fourth and Tenth Circuits are two,[98] and until recently the Seventh Circuit appeared to be another. In United States v. Barlow, the Seventh Circuit addressed a discovery claim based on racial profiling, a “selective law enforcement,tactic.”[99] In deciding that the District Court had not abused its discretion in denying discovery, the Barlow court followed Armstrong (Bass had' not yet been issued), finding *217 that defendant Barlow had not presented relevant and reliable data on the “similarly situated” prong of the test.[100]
4. The Seventh Circuit’s Davis Decision
But in United States v. Davis,[101] the en banc Seventh Circuit appeared to narrow the scope of Armstrong/Bass. Davis was an appeal from a pretrial order granting discovery in a stash-house reverse-sting case.[102] The defendants had alleged that the prosecutor, FBI, and ATF had engaged in racial discrimination, pointing to some discomfiting statistics: out of 94 defendants across 20 Northern District of Illinois stash-house sting. prosecutions, only six were non-Hispanic whites.[103] The statistics, however, revealed nothing about similarly -situated persons who were not prosecuted.[104] Nevertheless, the district court granted a broad discovery order, reasoning in part that the “overwhelming majority” of those prosecuted being persons of color met, by inference, the defendants’ burden under Armstrong/Bass.[105]
The Seventh Circuit agreed with the government that the district court’s reasoning was inconsistent with Armstrong. If Armstrong’s record, which showed the exclusive prosecution of African Americans for crack offenses, was not sufficient, then a showing that “three-quarters of the defendants in stash-house- cases have been black does not. suffices”[106]
The Seventh Circuit then addressed whether Armstrong/Bass was the relevant test at all. In this Circuit’s view, the key distinction lay - between prosecutors, who are “protected by a powerful privilege or covered by a presumption of constitutional behavior” recognized by Armstrong, and FBI/ATF agents, who “regularly testify in criminal cases” and whose “credibility may be relentlessly attacked by defense counsel.”[107] For these and other reasons, the Seventh Circuit decided that “the sort of considerations that led to the outcome in Armstrong do not apply to a contention that agents of the -FBI or ATF engaged in racial discrimination when selecting targets for sting operations, or when deciding which suspects to refer for prosecution.”[108]
Having rüled that Armstrong/Bass did not quité govern the -law-enforcement aspects of the defendants’ discovery request, the Seventh Circuit decided that the District Court’s comprehensive discovery order was nonetheless an abuse of discretion. Sweeping and overbroad, the order engulfed too much that did implicate prose-cutorial discretion and was not tailored to the boundaries of the case nor the scope of the defendants’ proffer.[109]
On remand, instead of issuing a “blunderbuss order,” the' district court was *218 ordered to take “measured steps” to determine the scope and boundaries of discovery.[110] First, the district court was to determine whether there was reason to believe that race played a role in the investigation — that “forbidden selectivity occurred or plausibly could have occurred”[111] — by evaluating the evidence already of record, new evidence acquired by the defendants, and (if necessary) the affidavits and limited testimony of case agents. If the inquiry gave the district court reason to believe that similarly situated persons would not have been pursued by law enforcement, in camera disclosure of targeting criteria might be called for. If the trail of breadcrumbs continued, additional targeted inquiries might be justified; and if the obtained information crossed the Armstrong/Bass threshold, the discovery could be “extended to the prosecutor’s office.”[112]
5. Davis’s Application to Washington’s Claims
In sum, despite not being a straightforward affirmance of a pro-defendant discovery decision, Davis does more or less what Washington would like this Court to do: find Armstrong/Bass inapplicable in part and send the case back to the District Court to make additional inquiries — bolstered, perhaps, by whatever evidence has become available since.
However, there are good reasons to be cautious about Davis, and its practical application in this case is not quite as straightforward as Washington suggests. While the Seventh Circuit did not follow Armstrong/Bass, Davis does not clearly state whether the test adopted in its stead was a variation of Armstrong/Bass or, alternatively, was intended to be a complete departure. For instance, Davis does not explicitly discuss the discriminatory purpose/intent prong of the traditional Armstrong/Bass analysis.[113] Davis might therefore be fairly described as an opinion entirely about discriminatory effect as a gateway to discovery. Moreover, Davis does not mention the Seventh Circuit’s earlier decision in Barlow at all — not to harmonize it, distinguish it, or explicitly overrule it.[114] Davis also arose on a differ *219 ent posture, where the defendant had prevailed below and, thus, benefitted from partial appellate deference to the trial court’s exercise of discretion. Here, by contrast, the District Court’s decision was not favorable to Washington; this Court’s deference thus tips the other way. The Davis framework was further influenced by the Seventh Circuit’s review of a pretrial decision, as indicated by the court’s repeated references to expediency — -“limited inquiries that can be conducted in a few weeks” so as to not “sidetrack[ ]” the case.[115] While any framework must be mindful of the pretrial context in which discovery motions will be filed and decided, we are reviewing a final judgment, one which (as discussed further below) is not unwound if we decide to remand.
6. Strict Application of Armstrong ¡Bass is Inappropriate
Despite our caution, we find ourselves in agreement with the core rationale of Davis\ the special solicitude shown to pros-ecutorial discretion, which animated the Supreme Court’s reasoning in Armstrong and Bass — and our own reasoning in our pre-Armstrong/Bass case law on the same subject[116] — does not inevitably flow to the actions of law enforcement, or even to prosecutors acting in an investigative capacity. Prosecutors are ordinarily shielded by absolute immunity for their prosecuto-rial acts,[117] but police officers and federal agents enjoy no such categorical protection,[118] And, as the Dams court observed, officers and agents are expected to testify in criminal cases, with their honesty and candor “open to challenge.”[119] That aspects of law enforcement and prosecutorial discretion are often intertwined does not make the distinction between the two realms any less legitimate; courts are often called upon to determine whether specific acts fall more into one category than the other.[120]
A challenge to a law-enforcement policy also implicates another area where immu *220 nity is limited. The ATF reverse sting model is familiar to us and other courts precisely because it is a defined operation, one with policies, manuals, targeting criteria, and standards. Its appearance from coast to coast is not some kind of convergent law-enforcement evolution, but instead is due to the promulgation of official policies by a federal agency. Claims of unconstitutional policies or practices, lodged against entities rather than individuals, often cannot be met with qualified or good-faith immunity defenses at all.[121] •
In sum, while we do riot lightly depart from the well-established Armstrong/Bass framework, the enforcement/prosecution distinction is a legitimate one, and'we therefore join the Davis court in finding Armstrong/Bass to be distinguishable on these facts. Accordingly, motions for discovery seeking information on putative claims of unconstitutional selective enforcement are not governed by strict application of the Armstrong/Bass framework.
Nevertheless, and as tacitly acknowledged by the Seventh Circuit, courts contemplating motions for discovery on selective enforcement claims must still be guided by the spirit of Armstrong/Bass, which incorporates the demands placed on the underlying substantive claims: not just “some evidence,’’ but the heightened “clear evidence” standard. Further, while we agree with a general approach of taking “measured steps” over the course of discovery, we decline to mandate a precise system or order that a district court must follow. As we have often said, matters of docket control and discovery are committed to broad discretion of the district court.[122] We are confident in the ability of district courts to react to the particular circumstances of a case — the likelihood of a near-term trial date, the complexity of the underlying matter, the strength of a defendant’s discovery proffer, the similarity to previous cases raising similar concerns, the need to avoid overly prejudicial or irrelevant disclosure, and so on — -in crafting a measured approach to discovery. Finally, we note that although we are now in a post-trial posture, the fact of the matter is that most, if not all, appeals from criminal discovery orders will be properly brought only after judgment is entered.[123]
7. Selective Enforcement Discovery Standard
We therefore hold as follows. In ruling on a pretrial discovery request that alleges selective prosecution and/or selective enforcement, a district court applies Armstrong/Bass to claims that implicate protected prosecutorial functions, such as those that arose in the namesake cases. If claims of selective law enforcement are raised, or there are “mixed” claims that involve prosecutors acting in investigative or other capacities (in short, performing functions that ordinarily would not draw absolute immunity), the standard guiding the district court’s discretion is different. While Armstrong/Bass remains the lodestar, a district court retains the discretion to conduct a limited pretrial inquiry into the challenged law-enforcement practice on a proffer that shows “some *221 evidence” of discriminatory, effect. The proffer must contain reliable statistical evidence, or its equivalent, and may be based in part on patterns of prosecutorial decisions (as was the case in Davis) even if the underlying challenge, is to law enforcement decisions.[124] Distinct from what is required under Armstrong/Bass, a defendant need not, at the initial stage, provide “some evidence” of discriminatory intent, or show that (on the effect prong) similarly situated persons of a different race or equal protection classification were not arrested or investigated by law. enforcement. However, the proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement.
If a district court finds that the above has been met, it may conduct limited inquiries of the sort recommended in Davis, and cabined to the same considerations of judicial economy and the need to avoid protracted pretrial litigation of matters collateral to the upcoming trial— as well as the need to avoid impinging on other areas of executive privilege. Areas of consideration could include the testimony, in person or otherwise, of case agents or supervisors, and the in camera analysis of policy statements, manuals, dr other agency documents. Relevant information, having passed the filter, can also be disclosed to the defendant, although the district court retains discretion to forgo disclosure of or otherwise restrict the use of information that, while relevant to a selective enforcement claim, might not ordinarily be the sort of discovery material available to a criminal defendant under Fed. R. Crim. P. 16 or Brady and its progeny. .
Throughout, the district court must be mindful that the end “goal” of such a discovery motion is a valid claim of selective enforcement under the heightened substantive standards; which we are not asked to diminish or distinguish. If the district court’s initial or secondary inquiry sees that destination recede or stand still, not advance, the court operates within its discretion to deny additional discovery and to proceed to trial.
That limited discovery of this sort may be granted in one case does not guarantee — and should not 'guaranteer — that it will be granted in another, similar case, even within the same district.[125] But courts may, of course, consider the product of earlier investigations in deciding whether to conduct pretrial discovery on the individual claims they happen to confront.
8. Remand is Necessary for the District Court to Exercise its Discretion under the Correct Framework
Having set forth the governing standard for selective enforcement cases, we address its application to Washington’s case. It is clear that the District Court thought itself bound by the more-demanding Armstrong/Bass standard across the entirety’ of Washington’s discovery request, and then again on reconsideration. Because it exercised its discretion under the incorrect standard, we would normally *222 remand for the District Court to reconsider its ruling in light of its now-enhanced discretion. The government,' however, advances two primary reasons why, in its view, remand is unnecessary.
First, the government emphasizes that it “did not actually select or target any of the defendants,” suggesting that a selective enforcement claim is categorically forestalled.[126] This argument was raised in and rejected by Davis. We agree with the Seventh Circuit that, although Berry “himself initiated matters by [asking] the informant for robbery opportunities and then chose his own comrades ...[,] it remains possible that the [government] would not have pursued the investigation had [the crew] been white.”[127]
Second, the government argues in essence that the matter need not be remanded because any error was harmless; Washington received everything to which he was entitled when the District Court gave him a redacted portion of an ATF manual on the eve of trial. The Fourth Circuit took such an approach in United States v. Have, decided shortly after Davis. Despite quoting Davis with approval and exhibiting some discomfort with the Armstrong/Bass test as applied to stash-house cases, the Fourth Circuit decided that the defendants “ha[d] not shown that they are entitled to discovery beyond what the government has already produced.”[128] While Washington also has not shown that he is “entitled” to anything beyond what he has already received, we think that the District Court, not our Court, is better positioned to make that determination.[129]
Accordingly, we will vacate the District Court’s discovery orders and remand for a renewed decision under the framework we articulate today. We emphasize that we are not directing the District Court to grant discovery; our collective thumbs are not on the scale. Rather, we commit the inquiry to the District Court’s considerable discretion. We note that the District Court may, if it so chooses, consider additional information offered by Washington on remand as part of his proffer, as well as any relevant information (such as testimony about the racial cast of prior prosecutions) that was disclosed at trial.
Two administrative considerations require additional attention. First, as indicated by the Supreme Court in Armstrong itself, discovery requests like Washington’s exist outside of the framework of Fed. R. Crim. P. 16, and are neither a challenge to nor a defense against the government’s actual case.[130] It is well established, moreover, that both discovery orders and substantive equal protection challenges are appealable only after entry of final judgment.[131] Accordingly, by remanding for partial reconsidera *223 tion of Washington’s discovery request, we do not unwind his conviction or otherwise undermine the jury’s verdict. If discovery is granted, and if it leads to a successful selective enforcement claim, then his constitutional rights can be vindicated at that time by striking the indictment in whole or in part.[132] Second, Washington did not file a motion to dismiss the indictment pursuant to Fed. R. Crim. P. 12(b), as his gateway discovery request was denied. Despite the requirement in Rule 12(b)(3) that certain motions be made “before trial,” we will not require defendants to file quixotic substantive motions even before their predicate discovery motions are granted or denied. In any event, we note that as of the 2014 revision to Fed. R. Crim. P. 12(b)(3), the language of the rule makes clear that the substantive motion must be made pretrial only if “the basis for the motion is then reasonably available.”
III. Conclusion
For the foregoing reasons, we will affirm the judgment of the District Court, vacate the discovery orders, and remand for further proceedings.

. See United States v. Pedrin, 797 F.3d 792, 794 (9th Cir. 2015) (explaining the basic framework of stash house reverse sting operations), cert. denied, - U.S. -, 136 S.Ct. 2401, 195 L.Ed.2d 771 (2016).

. 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996).

. 536 U.S. 862, 122 S.Ct. 2389, 153 L.Ed.2d 769 (2002) (per curiam).

. 793 F.3d 712 (7th Cir. 2015) (en banc).

. Our description of the trial and underlying scheme is drawn primarily from the District Court’s opinion denying Washington's motion for a new trial, United States v. Washington [hereinafter “Washington New Trial”], 184 F.Supp.3d 149 (E.D. Pa. 2016). Washington accepts the factual accuracy of the District Court’s opinion, see Washington Br. at 7 n,4, and both parties have structured their briefs around it, As Washington is not challenging the sufficiency of the evidence, we strive to recite the facts in a balanced manner, See. United States v. Cox, 851 F.3d 113, 118 n.1 (1st Cir. 2017).

. As captured by the recording, and as later explained at trial, the conspirators made frequent reference to “jawns’’ or “jauns,” a distinctive Philadelphia regionalism that serves as a wildcard stand-in for other nouns. See Dan Nosowitz, The Enduring Mystery Of 'Jawn', Philadelphia's All-Purpose Noun, Atlas Obscura, http://www.atlasobscura.com/ articles/the-enduring-mystery-of-jawn-philadelphias-allpurpose-noun (last visited Aug. 21, 2017; archived at https://perma.cc/6 XM6-JQEW); see also United States v. Gibbs, 190 F.3d 188, 200 n.4 (3d Cir. 1999) ("Apparently, jawn' is slang for any noun, and throughout this case it was used variously to describe a car, cocaine, a nightclub, and a beeper.”).

. Supplemental Appendix (S.A,) 55.

. S.A. 60-61.

. The government later obtained a superseding indictment against Washington. A minor modification of the original, it focused on Washington as a defendant and amplified a few of the factual allegations.

.Plea agreements under Fed. R. Crim. P. 11(c)(1)(C) “bind[] the court once the court accepts the plea agreement.”

. Discovery Motion at 1, ECF No. 126.

. United States v. Washington [hereinafter “Washington Discovery"’], No. 13-171-2, 2014 WL 2959493, at *7 (E.D. Pa. June 30, 2014).

. No. 11 CR 148-1, 2013 WL 6491476 (N.D. Ill. Dec. 10, 2013).

. We note that entrapment was not raised as . a defense and’is not now- at issue on appeal.

. See Order, ECF No, 219.

. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

. See Washington New Trial, 184 F.Supp.3d at 160-62.

. See U.S.S.G. § 4BLl(b),

. Supplemental Sentencing Memorandum at 2, ECF No. 275.

. S.A. 211.

. We have appellate jurisdiction through 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

. United States v. Hankerson, 496 F.3d 303, 310 (3d Cir. 2007).

. Gov't of the V.I. v. Vanterpool, 767 F.3d 157, 164 (3d Cir. 2014).

. Massaro v. United States, 538 U.S. 500, 504-05, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003); see also United States v. McLaughlin, 386 F.3d 547, 556 (3d Cir. 2004) (”[T]he lack of a fully developed record often precludes a comprehensive inquiry into the elements of strategy or tactics that may have entered into defense counsel's challenged decision.").

.See, e.g., United States v. Brown, 849 F.3d 87, 90 n.5 (3d Cir. 2017) ("To spare Brown from having res judicata attach to the ineffective assistance claim, we decline to address it here.” (internal quotation marks and citation omitted)).

. United States v. Polk, 577 F.3d 515, 520 & n.2 (3rd Cir.2009) (quoting United States v. Headley, 923 F.2d 1079, 1083 (3d Cir. 1991)).

. See Massaro, 538 U.S. at 506, 123 S.Ct. 1690 (‘‘[T]he § 2255 motion often will be ruled upon by the same district judge who presided at trial. The judge, having observed the earlier trial, should have an advantageous perspective for determining the effectiveness of counsel’s conduct and whether any deficiencies were prejudicial.”).

. See United States v. Jones, 336 F.3d 245, 254 (3d Cir. 2003) (reaching ineffectiveness claim when District Court "conducted a hearing with [the defendant] and his new counsel where it specifically considered ... allegations concerning the representation he received from his prior counsel”). The appendix as initially compiled lacked most of the ineffectiveness-stage papers and transcripts, outside of the District Court's decision itself and a single page of Washington's new-trial motion. We asked the government to supplement our record with the relevant filings (which are all sealed on the District Court docket and, as a result, are not readily available to us), so as to allow for the determination of the sufficiency of the trial record and a more-searching review of Washington’s ineffectiveness claim. We thank the government for filing the supplement.

. We note that Washington initially asked for substitution of counsel, but not a full hearing on trial counsel's constitutional effectiveness. A district court is ordinarily required to warn pro se litigants when a filing recharac-terization might implicate the second-or-suc-cessiveness bar of the Antiterrorism and Effective Death Penalty Act of 1996. See Castro v. United States, 540 U.S. 375, 383, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003); 28 U.S.C. § 2244(b). However, Washington's recharac-terized filing could not be counted as an initial 28 U.S.C. § 2255 motion, as he was not yet "in custody under sentence of a [federal] court.” 28 U.S.C. § 2255(a); see also United States v. Stockstill, 26 F.3d 492, 497 n.10 (4th Cir. 1994) (“Because [the defendant] advanced his claims prior to sentencing, a § 2255 motion would not have been appropriate at the time.”). Because the § 2244(b) bar was not implicated, and because the mere possibility of preclusion does not otherwise "significantly alter[ ]” Washington’s rights, no warning was necessary here. Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 245 (3d Cir. 2013). But see Mui v. United States, 614 F.3d 50, 51 (2d Cir. 2010) ("We hold that a defendant who raises on direct appeal ineffective assistance claims based on the strategies, actions, or inactions of counsel that can be, and are, adjudicated on the merits on the trial record, is precluded from raising new or repetitive claims based on the same strategies, actions, or inactions in a Section 2255 proceeding.”).

. United States v. Bishop, 629 F.3d 462, 469 (5th Cir. 2010).

. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

. Massaro, 538 U.S. at 505, 123 S.Ct. 1690,

. United States v. Travillion, 759 F.3d 281, 289-90 (3d Cir. 2014).

. United States v. Davenport, 775 F.3d 605, 608 (3d Cir. 2015).

. See Washington New Trial, 184 F.Supp.3d at 157; Sealed Supplemental Appendix 78; see also United States v. Cronic, 466 U.S. 648, 659-60 & nn. 25-26, 104 S.Ct. 2039, 80 L.Ed.2d 657(1984).

.See Williams v. Trammell, 782 F.3d 1184, 1200-01 (10th Cir. 2015) (analyzing substance ' abuse ineffectiveness under Strickland), cert. denied, — U.S. -, 136 S.Ct. 806, 193 L.Ed.2d 726 (2016); Frye v. Lee, 235 F.3d 897, 907 (4th Cir. 2000) ("[I]n order for an .attorney’s alcohol addiction to make his assistance constitutionally ineffective, there must be specific instances of deficient performance attributable to alcohol.”); see also Berry v. King, 765 F.2d 451, 454 (5th Cir. 1985) ("[Ujnder Strickland the fact that an attorney used drugs is not, in and of itself, relevant to an ineffective assistance claim.” (emphasis in original)).

.Washington argues that the jury twice heard evidence of Washington’s criminal history, once on direct and once on rebuttal. As the excerpt shows, however, the initial mention of Washington’s drug conidctiori was equivocal — “I’m pretty sure” — and broached in the context of an arrest, not a conviction.

. S.A. 176-77.

. Section 851 Information, ECF No. 202.

. June 8, 2015 Tr. at 99-100, ECF No. 245.

. United States v. Fazio, 795 F.3d 421, 426 (3d Cir. 2015).

. United States v. Cross, 308 F.3d 308, 315 (3d Cir. 2002).

. Vanterpool, 767 F.3d at 165 (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052).

.See Washington New Trial, 184 F.Supp.3d at 153 (recounting Washington's concern, during the final pre-robbery briefing, that co-conspirators Johnson and Ellis had purchased supplies from a grocery store, where the men could have been — and were — recorded on the store's surveillance system).

. In fact, the count-five acquittal strikes against Washington's claim that the jury used his drug conviction against him on the grounds of predisposition. Ample attention was drawn at trial to Washington’s alleged trigger-happy statements, yet the jury was not convinced of Washington’s guilt on count five.

. While Washington’s PSR grouped the offenses for sentencing purposes, the District Court did not treat them as a single unit, imposing separate sentences on the robbery and drug counts of the indictment. Accordingly, we assume without deciding that the counts are appropriately disaggregated for the purposes of Strickland prejudice.

. See, e.g., Washington Reply Br. at 7.

. While we assume without deciding that Washington could have prevailed on this theory, we note that a “caution” or “lack of total commitment” defense is difficult to successfully mount given the broad liability for drug-conspiracy charges. See United States v. Caraballo-Rodriguez, 726 F.3d 418, 425 (3d Cir. 2013) (en banc) ("To prove a conspiracy, the government must show: (1) a shared unity of purpose; (2) an intent to achieve a common illegal goal; and (3) an agreement to work toward that goal.”); see also Smith v. United States, 568 U.S. 106, 133 S.Ct. 714, 719, 184 L.Ed.2d 570 (2013) (explaining withdrawal from a conspiracy); United States v. Shabani, 513 U.S, 10, 17, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994) (holding that proof of an overt act is not required in a § 846 conspiracy).

.The government notes that no additional details were given about the drug offense, so the jury did not know its nature or severity. However, the jury could infer from the line of questioning that it was not a violent drug offense.

. Cf. e.g., Wilson v. Mazzuca, 570 F.3d 490, 502, 507 (2d Cir. 2009) (finding prejudice from admission of criminal history, in tandem with other errors, where the government presented a weak case in chief); Gilliam v. Sec'y for the Dep't of Corr., 480 F.3d 1027, 1033-34 (11th Cir. 2007) (per curiam) (finding no prejudice on § 2254(d) review when theory of defense was "sufficiently compromised by other evidence”); Lyons v. McCotter, 770 F.2d 529, 532 n.5 (5th Cir. 1985) (”[W]e conclude that the prosecutor’s case was far from overwhelming and that the introduction into evidence of Lyons' prior aggravated robbery conviction undermined the. reliability of his present conviction.”),

. See, e.g., United States v. Winebarger, 664 F.3d 388, 392 (3d Cir. 2011) (”[P]istrict courts are required to sentence defendants guilty of that crime to a teirm'of imprisonment no less than'the Congressionally prescribed minimum, unless an explicit exception to the minimum sentence applies.”). ■

. See United States v. Turner, 718 F.3d 226, 235 (3d Cir. 2013); cf. United States v. Archuleta, 412 F.3d 1003, 1007 (8th Cir. 2005) (reviewing newly raised constitutional argument for plain error)

. See United States v. Castro-Taveras, 841 F.3d 34, 54 (1st Cir. 2016) (declining to enforce forfeiture .when the government addressed the merits of unpreserved Fifth Amendment argument); United States v. Pendleton, 832 F.3d 934, 948 n.4 (8th Cir. 2016) (“[T]he Government does not assert forfeiture and instead argues for ,de novo review on the .merits, Thus, we.choose to apply the usual *209 standard for evaluating the sufficiency-of-the-evidence claim.”); see also United States v. Jones, 833 F.3d 341, 343 (3d Cir. 2016) (“Because we would reach the same result under either standard of review, we will apply de novo review, which is more favorable to [the defendant].”).
Our decision in United States v. Joseph, 730 F.3d 336 (3d Cir. 2013), is not to the contrary. Joseph "rectified] imprecisions” in our preservation and waiver jurisprudence, and clarified too the oft-overlooked distinction between "issues” and "arguments,” at least as we use those terms in this Circuit. Id. at 337, 341-42. To the extent the specific waiver or forfeiture framework in Joseph applies outside of Fed. R. Crim. P. 12, see id. at 338-39 nn.2-3, it does not limit our discretion to excuse waiver or forfeiture concerns as we do here, especially when the government or appellee overlooks or disregards waiver or forfeiture and instead asks for review of the merits. See also Government's Br. in United States v. Joseph, No. 12-3808, 2013 WL 1193044, at *16-20 (invoking waiver).

. Untied States v. Walker, 473 F.3d 71, 75 (3d Cir. 2007).

. The government suggests in its brief that Washington’s sentencing challenge is foreclosed by a sentence above the mandatory minimum. See Gov’t Br. at 57-58. We disagree. The District Court was clearly guided by the mandatory minimum term on the drug counts in crafting the overall sentence. As a result, Washington's challenge remains viable despite a sentence above the bare minimum authorized by law, Compare United States v. Cardena, 842 F.3d 959, 1001-02 (7th Cir. 2016) (finding that, when the district court appeared tp treat the mandatory minimum as the lower bracket for determining a below-Guidelines- sentence, court could not say that the mandatory minimum -had “absolutely no effect”), and United States v. Barnes, 769 F.3d 94, 98-99 (1st Cir. 2014) (reaching, the legality of a mandatory minimum sentence although the defendant’s net term was 10 years above the minimum becáusé' of references throughout to the mandatory minimum), with United States v. Ramírez-Negrón, 751 F.3d 42, 49 (1st Cir. 2014) (finding no due process error when a defendant's sentence was based "entirely on Guidelines considerations”), and Untied States v. Ramos, 695 F.3d 1035, 1049 (10th Cir. 2012) (concluding that a defendant lacked standing to challenge constitutionality of mandatory minimum because the “Actual sentence of eighty-seven months was not affected by the statutorily prescribed mandatory minimum” but was instead based on "the § 3553(a) factors and the Guidelines"),.

. See United States v. Twigg, 588 F.2d 373, 378 (3d Cir. 1978).

. See id. at 375-76, 380-81.

. Id. at 381.

. United States v. Combs, 827 F.3d 790, 795 (8th Cir. 2016).

. See United States v. Fattah, 858 F.3d 801, 813 (3d Cir. 2017) (citing Twigg for the proposition that ''[t]his Court has granted relief on a claim of outrageous government misconduct only once”).

. 826 F.3d 683, 694-95 (3d Cir. 2016); see also United States v. Mohamud, 843 F.3d 420, 435 (9th Cir. 2016) (recognizing that dismissal is warranted only in "extreme cases” (citation omitted)).

. See United States v. Sed, 601 F.3d 224, 229-31 (3d Cir. 2010) (describing the variation across courts of appeals).

. United States v. Ciszkowski, 492 F.3d 1264, 1270 (11th Cir. 2007); see also United States v. Rivera-Ruperto, 852 F.3d 1, 14 (1st Cir. 2017) (“Sentencing factor manipulation occurs where government agents have improperly enlarged the scope or scale of a crime.... Where the government engages in such manipulation, we recognize the court's power to impose a sentence below the statutory mandatory minimum as an equitable remedy.” (internal alterations, quotation marks, and citations omitted)). But see United States v. Lange, 862 F.3d 1290, 1296 (11th Cir. 2017) (observing that the Eleventh Circuit "has never reduced a sentence on the basis of sentencing factor manipulation”).

.See Sed, 601 F.3d at 229-31.

. Seel8U.S.C. § 924(c)(1).

. See U.S.S.G. § 2D1.1(c)(5) (2014).

. To the extent the government manipulated factors that have not been shown to prejudice Washington, the weight of those factors is diminished. Cf. Werts v. Vaughn, 228 F.3d 178, 198 (3d Cir. 2000) (evaluating prosecuto-rial misconduct due process claim for presence of prejudice).

. The career offender Guideline itself is based on the offense statutory maximum— here, life in prison, with or without the § 851 enhancement — so in that sense the Guidelines sentencing range was determined by a drug quantity. See U.S.S.G. § 4B 1.1(b) (2014); 21 U.S.C. 841(b)(1)(A). Again, though, the District Court did not sentence in accordance with that range, and — as we discuss infra— the 5 kilogram amount is far below what courts have approved in other cases.

. United States v. Labonte, 520 U.S, 751, 762, 117 S.Ct. 1673, 137 L.Ed,2d 1001 (1997); see also United States v. Sanchez, 517 F.3d 651, 671-72 (2d Cir. 2008) (rejecting due process challenge when the government filed § 851 notice against one defendant, but not his codefendants).

. That is not to say that we affirmatively endorse the prosecution’s decision here, which has the unavoidable appearance of punishing Washington for exercising his right to go to trial. But on these facts, this is not enough to declare the government's actions beyond the pale or invidiously motivated, especially with the longstanding recognition— both by us and by the Supreme Court — of the deference afforded to prosecutorial decisions. For better or worse, prosecutors have a great deal of power to use specific charging decisions to guide mandatory sentencing exposure, By way of example, a defendant in one recent New Jersey stash house case was charged in part with conspiring to possess with intent to distribute more than 5 kilograms of cocaine, exposing him to the mandatory minimum term. When the defendant agreed to plead guilty, the government filed a superseding information that simply deleted the drug quantity from the conspiracy charge, thereby eliminating the mandatory minimum. See U.S. Dep't of Justice Press Release, Burlington County, New Jersey, Man Sentenced To Eight Years In Prison For Scheme To Rob Drug Dealers At Gunpoint, https://www. justice.gov/usao-nj/pr/burlington-county-new-jersey-man-sentenced:eight-years-prison-‘ scheme-rob-drug-dealers (Feb. 8, 2017; archived at https://perma.ee/Y5XD-UULW); United States v. Forman, D.N.J. Crim. No. 1:14-cr-00152, ECF Nos. 27, 81.

. See United States v. Hare, 820 F.3d 93, 102-03 (4th Cir. 2016) (collecting cases for the proposition that "15 to 20 kilograms of cocaine" amounts to "considerably less than the quantity of cocaine at issue in other stash house sting cases”); United States v. Sanchez, 138 F.3d 1410, 1414 (11th Cir. 1998) ("The fact that the government’s fictitious reverse sting operation involved a large quantity of drugs does not amount to the type of manipulative governmental conduct warranting a downward departure in sentencing.”).

. June 3 Tr. at 84.

. June 3 Tr. at 85-86. These statements were made in the context of Agent Edwards’s trial testimony, not at sentencing. It does not appear that the justifications for the amount chosen were re-raised at sentencing. We acknowledge ' that Agent Edwards’s testimony indicates that all Philadelphia' stash-house stings crafted in accordance with ATF methodology will involve, in some sense, an amount above the mandatory minimum threshold; Insufficient evidence was presented to allow the determination of whether a lesser quantity, below the mandatory minimum amount, would have sufficed to entice a four-man crew. See, e.g., June 3 Tr. at 129 (testimony by Agent Edwards that his "courier” wanted only one to one and a half kilogram as a nonparticipant). But see Rivera-Ruperto, 852 F.3d at 15 ("Although it is certainly feasible that ... the agents could have used some lesser quantity of drugs and still made the deals look realistic, the mere fact that they did not, without more, does not establish that the agents engaged in the kind of extraordinary misconduct ... that, is required of a successful sentencing manipulation claim," (internal quotation marks and citations omitted)), A district court is, of course, free to probe this reasoning, especially if culpability or entrapment are raised as specific defenses.

. Ciszkowski, 492 F.3d at 1271.

. 199 F.Supp.3d 926, 942-45 (E.D. Pa. 2016).

. The government sought to appeal the McLean sentence, but (as the government explained at oral argument) was unable to" obtain ' the Solicitor General’s permission to pursue the appeal. See C.A. No. 16-3227 (order dismissing appeal entered Sept. 15, 2016). The defendant appealed the judgment of conviction, which we recently affirmed. See generally United States v. McLean, No. 16-2993, — Fed.Appx. -, 2017 WL 3309762 (3d Cir. Aug. 3, 2017) (nonprecedential).

. See McLean, 199 F.Supp.3d at 939-40 & n.13.

. We note that McLean contains an extensive recitation of the facts and factors that caused its district court to depart below the mandatory minimum. While constitutional challenges *213 to mandatory minimum sentences draw de novo review, it might be the case that a district court’s factfinding 'and underlying reasoning, as opposed to its application of a legal standard, may be due some level of deference. We need not resolve the question in this appeal.

. See Dennis, 826 F.3d at 699 (Ambro, J., concurring in part and dissenting in part).

. Washington Discovery, 2014 WL 2959493, at *2.

. Redland Soccer Club v. Dep't of the Army, 55 F.3d 827, 845 (3d Cir. 1995); see also Koon v. United States, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) ("A district court by definition abuses its discretion when it makes an. error of law.”), superseded by statute on other grounds as stated in United States v. Thurston, 358 F.3d 51, 70 (1st Cir. 2004). Although the government disputes whether Washington's appellate claim matches what he raised below, its response brief generally answers on the merits; the procedural objection is to the scope of his request, not the consistency of his legal theory. We are satisfied, from our review of the record, that Washington adequately developed the claim across his District Court submissions.

. See Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (“[T]he Constitution prohibits selective enforcement of the law based on considerations such as race.”); Wayte v. United States, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985).

. See, e.g,, United States v. Taylor, 686 F.3d 182, 197 (3d Cir. 2012); Harajli v. Huron Twp., 365 F.3d 501, 508 (6th Cir. 2004); United States v. Alameh, 341 F.3d 167, 173 (2d Cir. 2003); see also United States v. Whitfield, 649 Fed.Appx. 192, 196 n.11 (3d Cir. 2016) (nonprecedential) (“[T]he prima facie elements for both selective prosecution and selective enforcement are the same; discriminatory effect and discriminatory intent,”), cert. denied, — U.S. -, 137 S.Ct. 1063, 197 L.Ed.2d 186 (2017); Lacey v. Maricopa Cty., 693 F.3d 896, 920 (9th Cir. 2012) (discussing a civil selective enforcement claim); Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005) (same); Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d 1157, 1168 (10th Cir. 2003) ("These standards have been applied to traffic stops challenged on equal protection grounds.”). We cite Whitfield for its description of the law in our Circuit and do not assign it the weight of precedent.

. See United States v. Hare, 820 F.3d 93, 98-99 (4th Cir. 2016); United States v. Brantley, 803 F.3d 1265, 1271 (11th Cir. 2015); Johnson v. Crooks, 326 F.3d 995, 1000 (8th Cir. 2003) ("When the claim is selective enforcement of the traffic laws or a racially-motivated arrest, the plaintiff must normally prove that similarly situated individuals were not stopped or arrested in order to show the requisite discriminatory effect and purpose.”); see also Gov’t of V.I. v. Harrigan, 791 F.2d 34, 36 (3d Cir. 1986).

. 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996).

. 536 U.S. 862, 122 S.Ct. 2389, 153 L.Ed.2d 769 (2002) (per curiam).

. See Bass, 536 U.S. at 863, 122 S.Ct. 2389 ("[A] defendant who seeks discovery on a claim of selective prosecution must show *215 some evidence of both discriminatory effect and discriminatory intent.”); see also United States v. Arenas-Ortiz, 339 F.3d 1066, 1068 (9th Cir. 2003) ("The showing necessary to obtain discovery is somewhat less” than prevailing on the merits).

. Armstrong, 517 U.S. at 469, 116 S.Ct. 1480; Bass, 536 U.S. at 864, 122 S.Ct. 2389 (“Under Armstrong, therefore, because respondent failed to submit relevant evidence that similarly situated persons were treated differently, he was not entitled to discovery.”).

. See Armstrong, 517 U.S. at 470, 116 S.Ct. 1480; United States v. Thorpe, 471 F.3d 652, 657 (6th Cir. 2006); see also United States v. Al Hedaithy, 392 F.3d 580, 607-08 & n.24 (3d Cir. 2004) (rejecting under Armstrong/Bass a . selective prosecution discovery request premised on “numerous newspaper articles” showing rampant cheating on the Test of English as a Foreign Language exam; “[t]he defect in Al Hedaithy’s proffer is that none of this evidence indicates that similarly situated persons were treated differently. Demonstrating that thousands of other people have also cheated on the [ ] exam does nothing to identify persons who are similarly situated”).

. Armstrong, 517 U.S. at 465, 470, 116 S.Ct. 1480.

. See, e.g., Donna Coker, Foreword: Addressing the Real World of Racial Injustice in the Criminal Justice System, 93 J. Crim. L. & Criminology 827, 828-29, 846-47 (2003) (discussing, among other things, the problems with the "similarly situated” discovery standard, including the possibility that the “data ... may simply not exist” or is in “the exclusive control of the government”); Richard H. McAdams, Race and Selective Prosecution: Discovering the Pitfalls of Armstrong, 73 Chi.Kent L. Rev. 605, 640 (1998) ("The Armstrong holding and the implications of its reasoning create a barrier to discovery that, for the great majority of criminal cases, is insuperable.”); Thorpe, 471 F.3d at 663; see also Whitfield, 649 Fed.Appx. at 196 n.11; Erik Luna, Transparent Policing, 85 Iowa L. Rev. 1107, 1139 (2000) ("The bar for selective enforcement and prosecution claims has been set at a nearly unreachable height for the vast majority of criminal defendants, an example of an abstract right with no practical remedy.”).

. Gov't Br. at 31.

. Washington Discovery, 2014 WL 2959493, at *7.

. Washington Br: at 19.

. See id. (citing Hare, 820 F.3d at 100).

. See Whitfield, 649 Fed.Appx. at 196 n.11. The government says that we have been "reluctant to permit discovery into the government’s investigatory and prosecutorial practices without a substantial showing by the defendant.” Gov’t Br. at 31, While that is true, the two cases the government cites—Al Hedaithy and United States v. Abuhouran, 161 F.3d 206 (3d Cir. 1998)—discussed prosecuto-rial decision-making, such as the (nonconsti-tutional) challenge to substantial assistance motions in Abuhouran, see 161 F.3d at 216. They do not provide a definitive answer to the question here; whether we may look behind the law-enforcement curtain,

. Armstrong, 517 U.S. at 463-64, 116 S.Ct. 1480 (internal quotation marks and citation omitted),.

. See United States v. Alcaraz-Arellano, 441 F.3d 1252, 1264 (10th Cir. 2006) ("[Armstrong's] elements are essentially the same for a selective-enforcement claim.”); United States v. Mason, 774 F.3d 824, 829-30 (4th Cir. 2014).

. 310 F.3d 1007, 1010 (7th Cir. 2002).

. See id. at 1010-11.

. 793 F.3d 712 (7th Cir. 2015).

. We need not address Davis’s■ procedural intrigue, although we note that it marked the dividing line between the en banc majority and dissent. See Davis, 793 F.3d at 723 (Rovner, J., joined by Hamilton, J., dissenting) ("For all of the prudential reasons that we do not permit civil litigants to manufacture appellate jurisdiction, we should not allow an appeal based on the sort of non-final dismissal that was fabricated here.”). . •

. Davis, 793 F.3d at 714-15.

. See id. at 715.

. See Order at 2, United States v. Davis, N.D. Il. Crim. No. 13-cr-63-2 (order entered October 30, 2013).

. Davis, 793 F.3d at 719-20.

. Id. at 720.

. Id. at 721.

. See id. at 722.

. Id.

. Id. at 723.

. Id. at 722-23. Although it is of limited relevance to the actual legal issue on appeal, the "switch” in Davis arose after years of unease in Seventh Circuit district courts — and in the Northern District of Illinois in particular — about reverse sting cases. See, e.g., United States v. Paxton, No. 13 CR 103, 2014 WL 1648746, at *5 (N.D. Ill. Apr. 17, 2014) (granting discovery under Armstrong/Bass, in part because "no white defendants have been indicted for phony stash house cases since 2009, despite the diverse makeup of the Northern District of Illinois”). Post-Davis, the controversy continues. See Jason Meisner & Annie Sweeney, Lawyers: ATF Stings Racially Biased; U. of C.-led Team says Stash House Cases Show Feds Unfairly Targeted Minorities, Chi. Trib., Mar. 5, 2017, at Cl, available at http://www.chicagotribune.com/news/local/ breaking/ct-atf-stash-house-sting-racial-discrimination-met-20170303-stoiy.html (last visited Aug. 21, 2017; archived at https:// perma.cc/XY4G-MKYG). A report in one pending case, prepared by Columbia Law professor Jeffrey Fagan, concludes among other things that "race remains a statistically significant predictor of selection as a Stash House defendant.” See Report of Jeffrey Fagan, United States v. Alfred Washington, N.D. Il. Crim. No. 12-CR-632, ECF No. 510-2.

. It is perhaps true that, in a given investigation, a finding that a defendant would not have been prosecuted if he had been non-Hispanic white is enough to suggest an inference of discriminatory purpose/intent.

. At least one court has observed this ambiguity in the Seventh Circuit's case law in declining to adopt the prosecution/enforcement discovery dichotomy. See United States v. Lamar, No. 14 CR 726, 2015 WL 4720282, at *5 n.3 (S.D.N.Y. Aug. 7, 2015). The govern *219 ment, for its part, argues that Davis is wrongly decided, and points in particular to the Barlow that did not bark. See Gov't Br. at 39 n.13.

. Davis, 793 F.3d at 723.

. See, e.g., United States v. Torquato, 602 F.2d 564, 569-70 (3d Cir. 1979) (discussing the need to “minimize the intrusion on the prosecutorial function” in the context of the burden required to obtain an evidentiary hearing); see also In re Grand Jury, 619 F.2d 1022, 1030 (3d Cir. 1980).

. See, e.g., Buckley v. Fitzsimmons, 509 U.S. 259, 268-71, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993); Odd v. Malone, 538 F.3d 202, 208-09 (3d Cir. 2008).

. See Orsatti v. N.J. State Police, 71 F.3d 480, 483 (3d Cir. 1995); Forsyth v. Kleindienst, 599 F.2d 1203, 1216 (3d Cir. 1979) ("[Fjederal law enforcement officers are entitled only to qualified, or good faith, immunity.”).

. Davis, 793 F.3d at 720.

. The government suggests that when a district court is presented with mixed claims, or some selective enforcement and some selective prosecution claims, applying the Armstrong/Bass standard across the board is appropriate. Gov’t Br. at 28. This contention was rejected by Davis, 793 F.3d at 723 (observing that, if the "measured steps” discovery rises to the level required by Armstrong/Bass, the investigation can "extend[] to the prosecutor’s office”), and we agree that it unduly penalizes a defendant who casts a wide net. That said, it remains within the discretion of a district court — and, indeed, remains within the discretion of this District Court — to determine that a "selective enforcement” claim was either not appropriately raised or was simply a prosecution claim tailored to avoid the requirements of Armstrong/Bass. As always, a court must look beyond the labels affixed by the party and focus on the substance of what is sought.

. See Carver v. Foerster, 102 F.3d 96, 102-04 (3d Cir. 1996) (citing, among other things, Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980)).

. See, e.g., Sempier v. Johnson & Higgins, 45 F.3d 724, 734 (3d Cir. 1995); In re Fine Paper Antitrust Litig., 685 F.2d 810, 817 (3d Cir. 1982); United States v. Newman, 476 F.2d 733, 739 (3d Cir. 1973) (referring to criminal discovery rulings under Fed. R. Crim. P. 16).

. See United States v. Sciarra, 851 F.2d 621, 627-28 (3d Cir. 1988).

. We do not reach the question of the geographical boundaries of the initial evidence the defendant must provide — whether, in other words, the application of a -law enforcement policy or practice in the defendant's specific district might be contextualized by its application elsewhere, so long as the defendant adequately connects the practice elsewhere to his or her situation. We leave this issue to the district court's discretion and common sense, in light of the need to show that the policy ultimately acted upon, or did not act upon, persons similarly situated to the defendant.

. See Threadgill v. Armstrong World Indus., Inc., 928 F.2d 1366, 1371 (3d Cir. 1991) ("[T]here is no such thing as 'the law of the district.’

. Gov’t Br. at 35 n.10.

. Davis, 793 F.3d at 722-23.

. 820 F.3d 93, 101 (4th Cir. 2016).

. Further, we note that 1) the District Court copied the approach taken in the Alexander Northern District of Illinois case, and thus may not have been independently exercising its discretion; and 2) material relevant to a trial defense does not necessarily coincide with what is relevant to a challenge to an indictment on equal protection grounds.

. See Armstrong, 517 U.S. at 463-64, 116 S.Ct. 1480.

. See Jarkesy v. SEC, 803 F.3d 9, 26 (D.C. Cir. 2015); Adapt of Phila. v. Phila. Hous. Auth., 433 F.3d 353, 360 (3d Cir. 2006); United States v. Howard, 867 F.2d 548, 552 (9th Cir. 1989); cf. United States v. Zone, 403 F.3d 1101, 1106-07 (9th Cir. 2005) (per curiam) (merging discovery and substantive inquiry when underlying Double Jeopardy claim would have been appealable under the collateral order doctrine).

. See United States v. Jones, 159 F.3d 969, 978 & n.8 (6th Cir. 1998) (remanding for discovery on a selective prosecution claim, while noting that the remand "does not warrant a new trial, but only gives [the defendant] the opportunity to move to dismiss the indictment following discovery”); cf. United States v. Brizendine, 659 F.2d 215, 222 (D.C. Cir. 1981) (explaining how the court can "provide effective relief” on appeal from final judgment).