**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-4428
_____

UNITED STATES OF AMERICA

v.

JOSEPH MEEHAN,
Appellant
_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:11-cr-00440-001)
District Judge: Hon. Joel H. Slomsky
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
July 9, 2018
_____

Before: SHWARTZ, NYGAARD, and RENDELL, <u>Circuit Judges</u>

(Filed:  July 11, 2018)

_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

SHWARTZ, Circuit Judge

Joseph Meehan was convicted of committing armed robberies and related crimes and was sentenced to 835 months' imprisonment. He appeals his conviction and sentence, but none of the issues he raises has merit, so we will affirm.

I

A

1

In 2011, Meehan and Jonathan Andrews committed armed robberies of two pharmacies in Philadelphia, Pennsylvania. The police arrived while the second robbery was in progress, and Meehan fired several gunshots at the pharmacy's drive-up window to escape. Once outside, police confronted Meehan and Andrews. Meehan pointed his gun at the officers, police fired several shots at him, and Meehan and Andrews ran. During his flight, Meehan attempted an armed carjacking, but the owner refused to give him the car. He eventually went to Andrews's home and told Andrews that he had been shot in the foot during the escape.

After leaving Andrews's home, Meehan and his girlfriend, Leah Sabatino, traveled to a motel in Pennsauken, New Jersey. Meehan told Sabatino that if they were arrested, she should tell investigators that they were together on the night of the second robbery and that Meehan went to his ex-wife's house around midnight. Meehan and Sabatino were later arrested at the motel, where the authorities recovered a large quantity of prescription drugs. Meehan was interviewed by FBI agents and denied participating in the second robbery, reciting the alibi he wanted Sabatino to tell the police. On several

2

occasions after his arrest, Meehan asked Sabatino to accept responsibility for the drugs, repeated his purported alibi, and asked her not to cooperate with law enforcement.

2

A grand jury sitting in the Eastern District of Pennsylvania returned a second superseding indictment charging Meehan with two counts of Hobbs Act robbery, in violation of 18 U.S.C. § 1951; one count of attempted carjacking, in violation of 18 U.S.C. § 2119; three counts of using and carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1); one count of witness tampering, in violation of 18 U.S.C. § 1512(b)(3); one count of possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1); and one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).

In December 2012, Meehan filed a civil rights lawsuit under 42 U.S.C. § 1983 against certain New Jersey prison officials, alleging that he sustained injuries to his foot during his arrest and booking. Meehan was deposed.

Before his criminal trial, Meehan's counsel filed a motion to extend the deadline for filing pretrial motions and notified the Court that they may seek leave to withdraw. Counsel said they did not have any irreconcilable differences that would prevent them from representing Meehan but that "certain events and matters have arisen which have caused counsel great concern," which counsel said were "privileged." App. 57. The Court convened an ex parte hearing, during which counsel expressed concern that their pretrial motions and trial strategy could be inconsistent with Meehan's deposition testimony, about which they had only recently learned. Counsel reiterated that there were

3

no irreconcilable differences at that time but that such differences could arise. The Court granted the continuance.

Defense counsel thereafter filed a motion to preclude the introduction of Meehan's deposition at trial. The Government said it did not intend to introduce the deposition in its case-in-chief but reserved the right to use it if Meehan asserted a defense that contradicted his prior testimony. At argument on the motion, defense counsel sought another continuance, which the Court indicated it would deny, and counsel asked to be heard ex parte. During the ex parte hearing, counsel informed the Court that "[t]here are things that Mr. Meehan said in the deposition that are totally completely inconsistent with things that he said to us . . . ." App. 224. Counsel added that Meehan offered an alibi and the names of potential witnesses during his deposition that they had never before heard, and they sought a continuance to confront Meehan with the information and "really put to bed [] the issue of [him] testifying" at trial. App. 226. Counsel expressed concern about their ethical obligations should Meehan decide to testify. Back in open court, the District Court informed the Government that it would grant the continuance to protect Meehan's right to the effective assistance of counsel and to testify. The Court did not rule on the motion to preclude the deposition testimony, and the case proceeded to trial.

B

1

Jury selection began in June 2013. During voir dire, the District Court questioned Juror 44 individually, who initially expressed employment- and family-related hardships

4

and also raised his membership in the National Rifle Association as impacting his ability to serve as a juror, but he ultimately withdrew those concerns.

The District Court then probed Juror 44's statement that he had been the victim of a burglary roughly six years earlier. Defense counsel asked whether the fact that this case involved a robbery would affect his ability to be fair and impartial. Juror 44 responded, "Well, I would say yes, being[] that they never caught who did it. . . . I felt I didn't get enough satisfaction from the police." App. 239. He expressed additional frustration that the police did not follow-up with him about the matter.

The District Court told Juror 44 that his reaction to what occurred was normal but reminded him that "when you listen to the evidence in this case, you've got to put that aside, . . . and you've got to decide this case based solely upon what you see and hear in court. You can't hold it against the Government or the defendant. . . ." App. 240-41. Juror 44 said he understood, and when the Court asked whether he could be fair and impartial, the following ensued:

> Juror No. 44: I don't think I could be 100 percent impartial to that, to be honest. I mean I really, I lock my doors. I changed every lock on my house after that happened. . . .
>
> The Court: [A]s you hear evidence in this case [will] you[] be thinking about that situation? Or are you going to concentrate on the evidence here[?]
>
> Juror No. 44: Well, I would concentrate on the evidence.
>
> The Court: All right, what did you mean when you said you can't be 100 percent impartial?
>
> Juror No. 44: Well, it's pretty close. I mean, I know it's not exactly the same situation of what happened to me, you know. Like I said, I wasn't home when it happened, but I felt like, you know, my privacy was invaded upon.

5

App. 241.

In response to further inquiries from the Court, Juror 44 said that he understood the presumption of innocence, acknowledged that Meehan starts the trial with a clean slate, and affirmed that the Government has the burden to prove a defendant's guilt beyond a reasonable doubt. The Court then asked, "[k]nowing that, would you follow those instructions?" App. 242. Juror 44 stated, "I would definitely try to do that, I would do that," to which the Court asked, "Would you put aside any notions or feelings you have about the personal experience you went through and just judge this case based on what you see and hear in court?" App. 242-43. Juror 44 responded, "Okay, yeah, I will do that. . . . I mean, I know that's what I'm called upon to do." App. 243. After additional back-and-forth, Juror 44 reiterated he did not feel he could commit "100 percent" to deciding the case solely on the facts and not be influenced by his personal experience. App. 244.

The Court asked the parties whether they could strike Juror 44 by agreement, to which they both said "no." App. 244. The Court then said:

> All right, if both sides want him, he'll remain on the panel. I mean, he could not say that he would 100 percent set aside [his personal experience]. I mean, at one point he said he would, he can decide the case objectively. Then when properly questioned further, he said he could not. So, but if both sides are satisfied with, I think he said 98 percent, if I'm not mistaken, then it's your call. Okay? All right, so [Juror 44] will remain on the jury panel.

App. 245.

2

6

At trial, the Government presented testimony from Leah Sabatino, among other witnesses. Sabatino, who had been immunized and was under subpoena, appeared on the day of her scheduled testimony but left the courthouse before her testimony began. The District Court issued a material witness warrant for her, and when she returned to court later that day, the Government asked that she be detained overnight because she had been "such a trouble." App. 263. The Court noted its concern about Sabatino honoring her obligation to return because she appeared to have "a drug problem" and "a lifestyle problem," App. 266, but it ultimately agreed to release her.

Sabatino testified the next day. She began by explaining that she had left the courthouse because she was "really scared and nervous" and "got cold feet" because of the "feelings that [she] still ha[s]" for Meehan. App. 279-80. Sabatino then acknowledged battling a seventeen-year drug addiction and admitted that she had recently relapsed, using heroin, crack cocaine, and marijuana. She also admitted that she used heroin the morning of her testimony but maintained that it did not affect her ability to understand the questions posed to her. She explained the effects of withdrawal from heroin and stated that since her relapse, she needed to take the drug to feel normal.

Sabatino's drug addiction and the effects of her drug use were probed extensively during cross examination. After testifying for several hours, she asked to take a break, and at sidebar, the Court said it appeared Sabatino was becoming "physically uncomfortable," and the Government said it thought she might be "coming off her high" or "getting sick . . . because of her addiction." App. 381-82. After a short recess, defense

7

counsel asked whether Sabatino "needed the break because the heroin from this morning wore off," which she rejected. App. 385. Her testimony later concluded.

Upon request by defense counsel, the District Court supplemented its final jury instructions with two additional instructions regarding drug use and witness credibility:

> Members of the jury, I just want to add some instructions for you [] in determining the credibility of witnesses. And you may recall I said that in deciding what to believe[,] you may consider a number of factors, . . . and I want to add this factor: You can consider whether the witness was under the influence of an addictive drug during his or her testimony.
>
> In addition, when I charged you on the credibility of an addict or a substance abuser, I want you to consider also the following instruction: The testimony of a witness who admits to having taken drugs just prior to his or her testimony may be less believable because of the effect addictive drugs may have on his or her ability to perceive, remember or relate events in question, or the witness' appearance, behavior or manner while testifying.

App. 555-56.

### 3

At the close of evidence, defense counsel questioned Meehan about his right to testify, and Meehan said he elected not to do so. After closing arguments, the Court denied as moot all pending motions in limine, which included the motion to preclude Meehan's deposition testimony. The next morning, Meehan stated in open court that he wanted to testify. He claimed his counsel misinformed him that the motion had already been denied—even though no ruling had yet been made—and that it was for this reason he chose not to testify. The Court found that Meehan's decision not to testify was made knowingly and voluntarily and accordingly denied Meehan's request to re-open the record to permit him to testify. The jury convicted Meehan on all counts.

8

## C

### 1

During post-trial proceedings, Meehan argued that his counsel was ineffective for failing to strike Juror 44.  Counsel testified he decided not to do so for strategic reasons, explaining that

> at the time, I know that we were having arguments about certain jurors, and . . . we didn't want to argue about every single juror, we wanted to limit it where if we thought that the Government would not agree to him being stricken, to our best possible cases.
>
> And in that situation it was clear that [AUSA] Lloret was not going to agree to the juror being dismissed, so – and Mr. Meehan was sitting right there and we did not – we decided not to challenge him for cause, because we didn't want – we thought that – we wanted to kind of save our bullets, so to speak.
>
> . . . . [W]e thought that if we argued on every single juror that we would reduce our credibility with the Court when we thought that it was really necessary.
>
> And I think it's reasonable to think that I might have made a misjudgment on that, but I think we thought at this time – with this juror, that it was an argument we were going to lose.

App. 972-73.[1]  The District Court concluded that counsel was not ineffective for failing to strike Juror 44 for cause.

### 2

In his post-trial motion for a new trial, Meehan also alleged that counsel was ineffective for failing to adequately advise him of his right to testify.  Among other assertions, Meehan maintained that his counsel told him incorrectly that the motion to

---

[1] Defense counsel did challenge several jurors for cause.

preclude the deposition testimony had already been denied, and that he decided not to testify because he thought the Government would impeach him with the testimony.

At the post-trial hearing, both of Meehan's trial counsel testified that they did not tell Meehan the motion was denied, only that it had been tabled and that they believed it was highly likely to be denied because it was a voluntary deposition and no precedent supported excluding it. Counsel stated that they advised Meehan not to testify at trial because of his numerous prior inconsistent statements, and they also said they repeatedly told Meehan they would withdraw as counsel if Meehan insisted on testifying, given his inconsistent statements and their concern that he would commit perjury. The District Court concluded that counsel did not mislead Meehan about the status of the in limine motion and that counsel were not ineffective in advising Meehan not to testify. In addition, the Court said that it would have denied the motion because Meehan voluntarily gave the deposition and there would have been no basis to prevent the Government from using it on cross-examination.

3

At sentencing, the District Court calculated a Guidelines range of 151-188 months for the Hobbs Act robbery, carjacking, and drug counts, and added the seven-year mandatory consecutive sentence for the first gun-related § 924(c) count and two twenty-five year mandatory consecutive sentences for the second and third § 924(c) counts, for a total range of 835-872 months' imprisonment.

In addressing the factors under 18 U.S.C. § 3553(a), the District Court noted that "with all these mandatory minimums, one would think that alone would be sufficient."

10

App. 1282. Nonetheless, it concluded that although a sentence at the high end of the range was not necessary, "a guideline sentence is certainly . . . most appropriate given the crimes committed and Mr. Meehan's . . . criminal history." App. 1282, 1284. The District Court then imposed a sentence of 835 months' imprisonment.

Meehan appeals.

## II[2]

Meehan makes four arguments concerning his conviction and sentence. We will address each in turn.

## A

Meehan first argues that he was deprived of his right to the effective assistance of counsel by his counsel's failure to challenge Juror 44.[3] Specifically, he contends that Juror 44 did not commit unequivocally to following the Court's instructions and to putting his personal experience aside in weighing the evidence in Meehan's case, and that

---

[2] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

[3] We ordinarily do not consider ineffective assistance of counsel claims on direct appeal, but we have "recognized an exception to the rule when the trial record is sufficient to allow determination" of such a claim. United States v. Washington, 869 F.3d 193, 202-03 (3d Cir. 2017) (citations and internal quotation marks omitted). Meehan's is the "uncommon case," id. at 203, where we can resolve his ineffectiveness claim on direct appeal. The District Court held a post-trial, pre-sentencing hearing, at which Meehan's trial counsel explained his strategic reasons not to strike Juror 44 for cause. Its "development of the record amounted to, in effect, a mini collateral proceeding," which "provides us with a sufficient foundation for direct appellate review." Id. We therefore exercise our discretion to reach his ineffective assistance of counsel claim. "[W]e exercise plenary review over the legal components of ineffectiveness, assess any underlying findings of fact for clear error, and exercise independent judgment on whether those facts, as found by the District Court, show that counsel rendered ineffective assistance." Id. at 204 (citations and internal quotation marks omitted).

counsel's defective performance in allowing the juror to serve led to a structural error requiring a new trial.

Under the two-part standard established in Strickland v. Washington, 466 U.S. 668 (1984), for proving ineffective assistance of counsel, Meehan bears the burden of showing that (1) trial counsel's performance was deficient and "not supported by a reasonable strategy," and (2) trial counsel's errors resulted in prejudice.  Massaro v. United States, 538 U.S. 500, 505 (2003).  "[B]oth deficiency and prejudice must be proven to have a valid claim for relief."  United States v. Travillion, 759 F.3d 281, 289-90 (3d Cir. 2014).

The Sixth Amendment guarantees every criminal defendant "the right to a . . . trial[] by an impartial jury."  U.S. Const. amend. VI.  Juror examination through voir dire "serves to protect the right to an impartial jury by providing the parties a means of uncovering juror bias," United States v. Mitchell, 690 F.3d 137, 141 (3d Cir. 2012), and ensures that criminal defendants receive a determination of their guilt or innocence "based solely upon [the] evidence," United States v. Lloyd, 269 F.3d 228, 237 (3d Cir. 2001) (citations and internal quotation marks omitted).

Juror bias can be actual or implied.[4]  Mitchell, 690 F.3d at 142.  Actual bias is "the existence of a state of mind that leads to an inference that the person will not act with

---

[4] Implied bias, which is not asserted here, is "conclusively presumed as a matter of law" and is limited to a narrow class of jurors who are "highly unlikely . . . to be able to render impartial jury service," typically by virtue of their relationship to one of the participants.  Mitchell, 690 F.3d at 142-43 (citations, internal quotations and alterations omitted)

12

entire impartiality," and it may become apparent "when a [potential juror] admits partiality or may be inferred from responses to voir dire questioning." Id. (citations and internal quotation marks omitted).

To "rebut the presumption of a prospective juror's impartiality," it is not enough for a defendant to point to "the mere existence of any preconceived notion as to the guilt or innocence of the accused." Irvin v. Dowd, 366 U.S. 717, 723 (1961). Rather, a juror is deemed impartial so long as he "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Id. This does not mean a juror's expression of doubt about his own impartiality necessarily leads to a finding of actual bias. Hughes v. United States, 258 F.3d 453, 458 (6th Cir. 2001). Indeed, the Supreme Court has upheld the impaneling of jurors who, during voir dire, expressed doubts, or even disclaimed outright, their ability to be impartial. See Patton v. Yount, 467 U.S. 1025, 1032 (1984); Murphy v. Florida, 421 U.S. 794, 803 (1975). We therefore give broad latitude to the District Court to determine whether to excuse a prospective juror based on actual bias because it "possesses a superior capacity to observe the demeanor of prospective jurors and to assess their credibility." Mitchell, 690 F.3d at 142.

Here, Meehan has not shown Juror 44 was actually biased against him. First, Juror 44 never expressed an impression of or partiality against Meehan himself. See Murphy, 421 U.S. at 803. Second, the break-in at Juror 44's residence occurred six years before Meehan's trial and was sufficiently dissimilar to the pharmacy robberies at issue. Third, we agree with the District Court that it is not entirely clear in which direction Juror 44's alleged bias pointed. On the one hand, he expressed frustration at the police's lack

13

of response to the burglary, which he theoretically could have held against law enforcement, and by extension, the Government. On the other hand, his answers showed that the break-in was a difficult experience and that he "felt like . . . [his] privacy was invaded upon," but he acknowledged that this case, which involved armed pharmacy robberies, was "not exactly the same situation of what happened to [him]." App. 241. Finally, although Juror 44 at times waivered about whether his prior experience would impact him, the District Court conducted an extensive voir dire, reminded him of the importance of putting aside any lingering feelings he had from that experience, and received adequate assurances that he would consider the evidence and follow the Court's instructions. See Murphy, 421 U.S. at 802; Patton, 467 U.S. at 1039. In fact, the juror maintained that he understood the presumption of innocence and the Government's burden of proof and acknowledged that his oath required him to apply the Court's legal instructions to the facts of the case. His answers do not demonstrate that his experience would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424 (1985) (internal quotation marks omitted). Thus, even if another counsel may have asked to excuse Juror 44 for cause,[5] the record does not show that the juror's prior experience impaired his ability to decide the case based only on the facts and law. Therefore,

---

[5] While we do not have a record explaining why counsel did not use a peremptory challenge on Juror 44, we have a sufficient record upon which to conclude that Juror 44 did not have an actual bias, and so the failure to excuse him using a preemptory challenge would not provide a basis for relief.

14

because Meehan has not shown Juror 44 harbored an actual bias, his first claim for ineffective assistance of counsel fails.

B

Meehan also argues that his trial counsel had a conflict of interest that adversely affected their representation and resulted in a fundamentally unfair trial. Specifically, Meehan contends that trial counsel breached their duty of loyalty to him by divulging privileged communications to the District Court, which he claims interfered with his right to testify. This argument is meritless.[6]

The Sixth Amendment guarantee of the effective assistance of counsel comprises two correlative rights: the right to counsel of reasonable competence and the right to counsel's undivided loyalty. Virgin Islands v. Zepp, 748 F.2d 125, 131 (3d Cir. 1984). The mere possibility of conflicting interests is insufficient to establish a constitutional violation. Rather, "[t]he conflict of interest must be actual." Id. at 136-37 (citations and internal quotation marks omitted).

At the outset, we note that Meehan does not claim his counsel's loyalties were divided by their concurrent representation of another defendant or witness. See id. at 135. Rather, he asserts that his trial counsel were attempting to "protect [themselves] from a future attack based on the effectiveness of [their] representation." Appellant's Br. at 51. The record belies his contention and demonstrates that counsel acted reasonably and ethically under the circumstances.

---

[6] The record is sufficiently developed for us to review this claim on direct appeal. See Virgin Islands v. Zepp, 748 F.2d 125, 133 (3d Cir. 1984).

15

First, counsel did not paint Meehan in an unfair light to the District Court, label him a liar, or bar him from testifying. Counsel simply informed the Court that Meehan's deposition testimony was inconsistent with other statements he had made, most specifically about persons who could provide an alibi, and whose identities are not privileged.[7] See Fed. R. Crim. P. 12.1(a). Second, counsel reasonably advised Meehan not to testify, given his prior record and many inconsistent statements. Third, the District Court found that Meehan was apprised of his right to testify and knowingly and voluntarily waived that right, and we see no reason to disturb the Court's finding. Finally, even if we were to credit Meehan's assertion that the sole reason he chose not to testify was because his counsel told him incorrectly that the motion to preclude his deposition testimony had already been denied, the District Court explicitly stated that had it ruled, it would have denied the motion. Thus, the condition that Meehan said caused him not to testify—namely, the belief that the Court denied his motion to bar use of his deposition—would have come to fruition had the Court ruled on the motion, and thus he still would not have testified. Therefore, his belief about the status of the motion was consistent with what the Court would have done had it ruled, and his decision about testifying would not have been different. For all of these reasons, his second claim for ineffective assistance of counsel fails.

---

[7] To the extent counsel disclosed any privileged communications—which we doubt—in informing the District Court ex parte that Meehan's deposition testimony was "completely inconsistent with things that he said to us before," App. 224, counsel's statement was limited, appropriate, and necessary to secure the continuance they sought for Meehan's benefit.

16

C

Next, Meehan argues that the District Court plainly erred in not evaluating prosecution witness Sabatino's competency after she admitted to using heroin the morning of her testimony.[8]  We disagree.

Every witness is presumed competent to testify, Fed. R. Evid. 601, so long as the witness (1) has personal knowledge of the matter, Fed. R. Evid. 602, and (2) gives an oath or affirmation to testify truthfully, Fed. R. Evid. 603.  There are "[n]o mental or moral qualifications for testifying as a witness," and "[a] witness wholly without capacity is difficult to imagine."  Fed. R. Evid. 601, Advisory Committee Notes to 1972 Proposed Rules.  "[M]ental capacity [is] . . . highly relevant to credibility and require[s] no special treatment to render [evidence about mental capacity] admissible along with other matters bearing upon perception, memory, and narration of witnesses."  Id.  Because "[t]he question is [] particularly suited to the jury as one of weight and credibility," "[d]iscretion is regularly exercised in favor of allowing the testimony."  Id.  The trial court "must decide any preliminary question about whether a witness is qualified," Fed. R. Evid. 104,

_____

[8] Because Meehan's trial counsel did not object to Sabatino's competency to testify at trial, we review for plain error.  Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 733 (1993).  Under plain error review, we will "grant relief only if we conclude that (1) there was an error, (2) the error was 'clear or obvious,' and (3) the error 'affected the appellant's substantial rights.'"  United States v. Stinson, 734 F.3d 180, 184 (3d Cir. 2013) (quoting Puckett v. United States, 556 U.S. 129, 135 (2009)).  If all three prongs are satisfied, we may exercise our discretion to correct the error if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings."  Id. (alterations omitted).

and its determination about the competency of a witness to testify falls within its sound discretion, United States v. Hicks, 389 F.2d 49, 50 (3d Cir. 1968).

Here, the District Court committed no error in permitting Sabatino to testify. The Court was in the best position to observe her demeanor and to determine her ability to comprehend the questions posed to her. Furthermore, the record reflects she understood the questions posed and provided responsive answers. Moreover, the Court allowed defense counsel to probe Sabatino's drug addiction and recent heroin use at length, and there is no indication that counsel's questioning of Sabatino on this issue crowded out its ability to question her on other pertinent subjects. Finally, the Court specifically instructed the jury about the effect of drug use on a witness's credibility, stressing that drug use may impact a witness's "ability to perceive, remember or relate events in question." App. 556. Because the Federal Rules of Evidence did not require the District Court to do anything further—let alone, as Meehan contends, conduct a competency evaluation—Meehan's argument fails.

## D

Finally, Meehan requests that we remand for resentencing in light of Dean v. United States, 137 S. Ct. 1170, 1177-78 (2017), which held that a court may consider a consecutive mandatory minimum sentence imposed under § 924(c) when calculating a just sentence for the underlying predicate counts.[9] Id. Remand, however, is unnecessary because, unlike in Dean, the District Court never stated or even suggested that it could

_____

[9] Because Meehan raises this issue for the first time on appeal, we review for plain error. United States v. Flores-Mejia, 759 F.3d 253, 259 (3d Cir. 2014) (en banc).

18

not consider the fifty-seven year mandatory minimum sentence on the § 924(c) counts in sentencing Meehan on the predicate counts. Rather, the record reflects that the District Court considered both the length of the mandatory sentence and the other offenses in concluding that a total sentence at the low end of the Guidelines range was appropriate given the violent nature of Meehan's offenses and his extensive criminal history. Thus, we find no error in Meehan's sentence.

## III

For the foregoing reasons, we will affirm.